disposition of the *Apprendi* issue, nor is it necessary for us to resolve the question of whether *Ramirez* remains good law. Nevertheless, in my view, continued reliance upon *Ramirez* is questionable at best.

Returning to the main point of this separate opinion, I believe that the evidence is overwhelming that Rena Benford conspired to possess at least 5 grams of crack cocaine or 500 grams of cocaine powder. I therefore believe that a reasonable jury would have found her guilty beyond a reasonable doubt of being involved with at least one of these minimum quantities of cocaine. For this reason, I would affirm the district court's sentence of Rena Benford under § 841(b)(1)(B).

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0310A (6th Cir.)
File Name: 02a0310a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
		*Plaintiff-Appellee,*

		*v.*

SUZETTE MIRANDA STEWART (99-5615); CALVIN NELSON TRAMBLE (99-5850); CHARLES ROSSELL, also known as Dog, also known as Snoopy (99-5852); TIMOTHY DEMARCUS LANXTER, also known as Little Man (99-5853); NATHAN BENFORD, also known as Fred, also known as Nate (99-6248); RENA YVONNE BENFORD, also known as Yvonne Redding, also known as Granny, also known as Renee Redding, also known as Rena Redding, also known as Rena Benford (99-6249),
		*Defendants-Appellants.*

Nos. 99-5615/
5850/5852/
5853/6248/6249

1

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 98-00077—R. Allan Edgar, Chief District Judge.

Argued (99-5615/5850/5852/6248):  July 31, 2001
Submitted (99-5853/6249):  July 31, 2001

Decided and Filed: September 10, 2002

Before:  CLAY, GILMAN, and WALLACE, Circuit
Judges.*

————————

**COUNSEL**

**ARGUED:**  Clayton M. Whittaker, FOSTER, FOSTER,
ALLEN & DURRENCE, Chattanooga, Tennessee, Neal L.
Thompson, Chattanooga, Tennessee, Jimmy F. Rodgers, Jr.,
SUMMERS & WYATT, Chattanooga, Tennessee, William
H. Ortwein, ORTWEIN & ASSOCIATES, Chattanooga,
Tennessee, for Appellants. Gregg L. Sullivan, ASSISTANT
UNITED STATES ATTORNEY, Chattanooga, Tennessee,
for Appellee. **ON BRIEF:** Clayton M. Whittaker, FOSTER,
FOSTER, ALLEN & DURRENCE, Chattanooga, Tennessee,
Neal L. Thompson, Chattanooga, Tennessee, Jimmy F.
Rodgers, Jr., Jerry H. Summers, SUMMERS & WYATT,
Chattanooga, Tennessee, Paul D. Cross, Monteagle,
Tennessee, William H. Ortwein, ORTWEIN &
ASSOCIATES, Chattanooga, Tennessee, W. Gerald Tidwell,
Jr., Chattanooga, Tennessee, for Appellants.  Gregg L.
Sullivan, ASSISTANT UNITED STATES ATTORNEY,
Chattanooga, Tennessee, for Appellee.

CLAY, J., delivered the opinion of the court, in which
GILMAN, J. and WALLACE, J., joined, except as to

———————
     *The Honorable J. Clifford Wallace, Circuit Judge of the United
States Court of Appeals for the Ninth Circuit, sitting by designation.

significance of the evidence that did implicate her in the drug-
trafficking activities.  Any one of the four incidences
described above, for example, provides sufficient proof in and
of itself to establish that Rena Benford was involved in
possessing or trafficking in at least 5 grams of crack cocaine
or 500 grams of cocaine powder.  This is especially true in
light of the fact that Rena Benford presented no evidence to
contest the drug quantities attributable to her.  When these
four incidents are considered cumulatively, I find it difficult
to imagine any scenario in which the jury would have
returned a guilty verdict against Rena Benford and yet not
found that the evidence supporting her involvement in the
quantity of drugs was sufficient, beyond a reasonable doubt,
to place her within the sentencing range of § 841(b)(1)(B).

I believe that one final matter tangentially related to Rena
Benford's sentence merits a brief comment.  The lead opinion
relies upon *United States v. Ramirez*, 242 F.3d 348 (6th Cir.
2001), at several points in its discussion of the *Apprendi*
issue.  In *Ramirez*, this court held that where the quantity of
drugs increases a defendant's mandatory minimum sentence,
even if it does not increase the potential penalty above the
statutory maximum sentence, the quantity must be set forth in
the indictment, submitted to the jury, and proved beyond a
reasonable doubt.  *Id*. at 351-52.  But in *Harris v. United
States*, 122 S. Ct. 2406 (2002), the Supreme Court held that
*Apprendi* does not apply to mandatory minimum sentences,
so long as the required minimum sentence remains below the
statutory maximum penalty for the offense committed.
*Harris*, 122 S. Ct. at 2418, 2420 (holding that *Apprendi* did
not apply to the two-year increase in the defendant's
mandatory minimum sentence for brandishing a firearm
during a drug-trafficking crime because "the facts guiding
judicial discretion below the statutory maximum need not be
alleged in the indictment, submitted to the jury, or proved
beyond a reasonable doubt").  This apparent conflict between
*Harris* and *Ramirez* does not affect the lead opinion's

The testimony of Greg Vinson provides still another example of Rena Benford's involvement in possessing and distributing a quantity of cocaine powder that places her within the sentencing range of § 841(b)(1)(B).  Vinson testified that Rena Benford accompanied Nathan Benford to Louisville, Kentucky, where they retrieved about 500 grams of cocaine powder.  They then took the cocaine back to Chattanooga, Tennessee.  As with Billingsley's testimony, I believe that Rena Benford would have had every reason to cast doubt upon Vinson's credibility.  Rena Benford's trial strategy, if she hoped to be acquitted, would have required her to deny any involvement with transporting this quantity of drugs from Louisville to Chattanooga.  The absence of a jury determination of drug quantity, therefore, does not negate what Rena Benford had to accomplish at trial in order to avoid being convicted.

Yet another piece of evidence that leads me to believe that a jury would have found beyond a reasonable doubt that Rena Benford conspired to possess or traffic in the quantity of illegal drugs necessary for sentencing under § 841(b)(1)(B) is that the authorities seized $20,000 in cash from her residence.  As the lead opinion acknowledges, Rena Benford did not deny that this money was connected to drug activity.  Myron Hilt's testimony established that the Benfords were buying and selling cocaine powder at prices ranging from $20,000 to $29,000 per kilogram.  Rena Benford's acknowledgment that the $20,000 in cash found in her residence was related to drug transactions is therefore sufficient proof by itself to show that she was involved in a conspiracy to possess or traffic in more than 500 grams of cocaine powder.

The lead opinion notes that Rena Benford's counsel would frequently have no need to cross-examine witnesses for several days because the testimony did not relate to his client.  But the relatively few references to Rena Benford in comparison to those involving her husband do not negate the

Defendant Rena Yvonne Benford's sentence with respect to which GILMAN, J. (pp. 60-64), delivered a separate opinion concurring in part and dissenting in part, joined by WALLACE, J.

---

## AMENDED OPINION

---

CLAY, Circuit Judge.  This consolidated case, involving six members of a drug trafficking conspiracy in Chattanooga, Tennessee, presents several issues for consideration.  The Defendants appeal their judgments after being convicted, *inter alia*, of conspiracy to distribute and possess with intent to distribute cocaine hydrochloride and/or cocaine base, specifically, "crack," in violation of 21 U.S.C. §§ 841(a), 846, and being sentenced to various terms of imprisonment and supervised release.

In **Case No. 99-5615**, Suzette Miranda Stewart ("Stewart") brings an *Apprendi* challenge to her sentence entered pursuant to a guilty plea on the drug conspiracy charge.  Stewart also appeals the two-level enhancement of her base offense level under United States Sentencing Commission, Guidelines Manual, ("USSG") § 2D1.1(b).  In **Case No. 99-5850**, Calvin Nelson Tramble ("Tramble") appeals his conviction upon pleading guilty to aiding and abetting money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  Tramble also appeals his sentence after pleading guilty to the drug conspiracy charge, raising an *Apprendi* challenge as well as challenging the three-level enhancement for his role in the offense under USSG § 3B1.1(c).  In **Case No. 99-5852**, Charles Rossell ("Rossell") appeals his sentence pursuant to a guilty plea on the drug conspiracy charges on several grounds, including (1) an *Apprendi* challenge; (2) the district court's refusal to reduce his statutory minimum sentence under the "safety valve" of USSG § 5C1.2(2) and 18 U.S.C. § 3553(f); (3) a two-level enhancement of his base offense

level under USSG § 2D1.1(b); and (4) the district court's refusal to grant a downward departure under USSG § 5K2.0 for "exceptional circumstances." In **Case No. 99-5853**, Timothy Demarcus Lanxter ("Lanxter") appeals his sentence pursuant to a plea of guilty to the drug conspiracy charge based upon the district court's decision to sentence him to a term of imprisonment above the applicable range under the sentencing guidelines after departing downward from the statutory minimum sentence pursuant to 18 U.S.C. § 3553(e). In **Case No. 99-6248**, Nathan Benford ("Benford") challenges his conviction based upon the district court's denial of his motion to suppress wiretap evidence as well as the court's use of challenged jury instructions. Benford also challenges his sentence on the drug conspiracy charge under the *Apprendi* line of cases. Finally, in **Case No. 99-6249**, Nathan Benford's wife, Rena Benford ("Mrs. Benford"), also appeals the denial of a motion to suppress wiretap evidence. In addition to raising an *Apprendi* challenge to her sentence on the drug conspiracy charge, Mrs. Benford also challenges a two-level enhancement of her base offense level under USSG § 2D1.1(b).

For the reasons that follow, we **AFFIRM** the convictions and sentences of all Defendants. However, as explained in Section IV(E) of the lead opinion, Judge Clay would **VACATE** Mrs. Benford's sentence and **REMAND** for re-sentencing within the statutory range provided by 21 U.S.C. § 841(b)(1)(C).

## BACKGROUND

In the mid 1990s, FBI agents in Chattanooga, Tennessee, engaged in a long-term investigation into a possible drug trafficking conspiracy involving Nathan Benford, his wife, Rena Yvonne Benford, and several of their associates. The agents obtained authorization for electronic surveillance of land-based telephone lines at several premises as well as

I initially note that the government's proof against Rena Benford involved some of the very evidence that the lead opinion relies upon to conclude that Nathan Benford "was involved with quantities of drugs well above the requisite amounts needed for sentencing under § 841(b)(1)(A)." (Lead Op. at 41) The trial testimony of Myron Hilt, for example, established that Rena Benford approached Hilt and Nathan Benford when they were counting out $29,000 in cash that they had obtained through the sale of a kilogram of cocaine. Although Rena Benford did not assist them in counting the proceeds, she was the one who placed the money in a safe located at the Uptown Supper Club. Moreover, Rena Benford was instructed by her husband to give the money to Victor Freeman when he arrived at the Supper Club as partial payment for the purchase of two kilograms of cocaine powder. This single transaction involved enough cocaine powder to justify sentencing Rena Benford under § 841(b)(1)(B).

The record also includes testimony regarding Rena Benford's involvement in possessing and distributing actual drugs, rather than simply handling the proceeds from drug sales. For example, Cleveland Billingsley observed Rena Benford take a quantity of cocaine powder and "cook" it into one ounce of crack cocaine. This incident alone, like Rena Benford's actions in connection with counting her husband's drug-sale proceeds, involved a sufficient amount of crack cocaine—28.35 grams—to warrant sentencing Rena Benford under § 841(b)(1)(B). Although Rena Benford might not have realized the necessity of contesting the quantity of crack cocaine that she allegedly cooked, she surely would have known that any hope for an acquittal would require her to cast doubt upon Billingsley's testimony. I therefore believe that Rena Benford would have used every means at her disposal to challenge Billingsley's credibility.

---

## CONCURRING IN PART, DISSENTING IN PART

---

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part.  I concur in all aspects of the lead opinion other than its decision to vacate the sentence of Rena Benford and to remand the case in order to resentence her within the statutory range provided by 21 U.S.C. § 841(b)(1)(C).  In my opinion, the evidence at trial was overwhelming that Rena Benford conspired to possess at least 5 grams of crack cocaine or 500 grams of cocaine powder.  I would therefore affirm the district court's decision that sentenced Rena Benford under the statutory range set forth in 21 U.S.C. § 841(b)(1)(B).

The lead opinion compares the evidence that was presented at trial regarding Nathan Benford's involvement in drug trafficking with the testimony that implicated Rena Benford in this illegal activity.  Although I recognize that the quantity of the government's proof against Nathan Bedford was substantially greater than its evidence against Rena Benford, this fact does not, in my opinion, preclude us from concluding that a jury would have found beyond a reasonable doubt that Rena Benford conspired to possess at least 5 grams of crack cocaine or 500 grams of cocaine powder.  To put it simply, we need not be concerned with whether the evidence against Rena Benford was "super-overwhelming" or just "barely overwhelming," so long as it was indeed overwhelming.  *See Neder v. United States*, 527 U.S. 1, 17 (1999) (explaining that "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless").

mobile phones, which was conducted between April 22, 1998 and July 30, 1998.  These wiretaps, in conjunction with traditional surveillance and investigatory methods, revealed a vast drug trafficking conspiracy in the Chattanooga, Tennessee and Louisville, Kentucky areas involving Defendants.  The illegal operations were conducted using several premises, including the Uptown Supper Club, which is a nightclub operated by the Benfords, the S&S Market, a convenience store managed by Stewart and owned by her father, as well as several of Defendants' residences.  Throughout the investigation, FBI agents acted on the information they received from the wiretap surveillance.  At one point, an undercover agent posed as one of Benford's associates and was able to pick up a package of crack cocaine from one of the co-defendants.

On August 26, 1998, Defendants were charged, along with twenty-four co-defendants, with one count of conspiracy to "distribute and possess with intent to distribute cocaine hydrochloride and cocaine base ('crack')," in violation of 21 U.S.C. § 841(a) and 21 U.S.C. § 846.  One month later, a superseding indictment retained the drug conspiracy charge in Count One and added charges of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) against the Benfords and Tramble.  However, the superseding indictment failed to allege the quantity of drugs attributable to each Defendant.  Stewart, Tramble, Rossell and Lanxter all pleaded guilty to the drug conspiracy charge.  Tramble also pleaded guilty to the money laundering charge.  Their plea agreements also failed to specify the relevant drug quantities.  The Benfords proceeded to trial, after which they were convicted on the drug conspiracy charge and one of the money laundering

charges.[1] At Defendants' respective sentencing hearings, the district court received evidence which was used to determine the quantity of drugs attributable to each of them. The court handed down sentences specifying terms of imprisonment and supervised release, as well as special assessments for each Defendant. All Defendants filed timely notices of appeal.

## DISCUSSION

## I. MOTIONS TO SUPPRESS WIRETAP EVIDENCE

At the trial of Nathan and Rena Benford, the government introduced into evidence recorded telephone conversations by several members of the drug conspiracy. The Benfords both moved to suppress the wiretap information prior to trial, and also requested an evidentiary hearing on the issue; however, the district court denied the motions to suppress without the benefit of a hearing. On appeal, the Benfords contend that the affidavit used to obtain the wiretap warrant did not satisfy the requirements of 18 U.S.C. § 2518(1)(c) and, further, that they were improperly denied an evidentiary hearing on this matter in violation of *Franks v. Delaware,* 438 U.S. 154 (1978), because some of the statements in the affidavit were either knowingly false or made with reckless disregard as to their veracity. We reject both of these claims.

### A.

As a general matter, this Court reviews the district court's factual findings on suppression issues for clear error, and its legal conclusions under the *de novo* standard. *United States*

---

[1]Nathan Benford was acquitted of Count Three of the Superseding Indictment, which was an additional § 846 conspiracy charge. Rena Benford was acquitted of Counts Four and Five of the Superseding Indictment, which were also additional § 846 conspiracy charges. The Benfords were also acquitted of three other money laundering charges.

determined that the appropriate starting point for the defendant's downward departure was his mandatory minimum sentence. Other circuits have followed the same logic used in *Hayes*. *See, e.g., United States v. Li*, 206 F.3d 78, 89 (1st Cir. 2000) (holding that the proper starting point from which a departure is to be subtracted or to which it must be added is the greater of the guideline range or the mandatory minimum); *United States v. Head*, 178 F.3d 1205 (11th Cir. 1999).

We find this logic persuasive as well. To hold otherwise would afford defendants a double benefit by first permitting them to avoid a higher mandatory minimum sentence and then granting a departure from an even lower sentencing guidelines range. We do not believe that Congress intended such a result. For these reasons, we now join our sister circuits and hold that the appropriate starting point for calculating a downward departure under 18 U.S.C. § 3553(e) is the mandatory minimum sentence itself.

## CONCLUSION

For the reasons we have discussed, we **AFFIRM** the judgments of the district court in all respects.

regarding the interpretation of a statute and the sentencing guidelines; thus, we apply the *de novo* standard of review. *United States v. Rutana*, 18 F.3d 363, 365 (6th Cir. 1994).

**B.**

Lanxter contends that once the district court grants a § 3553(e) motion to depart from a statutory minimum sentence, the resulting sentence may be no higher than the upper end of the otherwise applicable guideline range. He therefore claims that after the downward departure, his resulting sentence should have been somewhere within the guideline range of fifty-one to seventy-one months. This is an issue of first impression in this Circuit. However, the other appellate courts that have considered this issue have rejected similar arguments.

In *United States v. Hayes*, 5 F.3d 292, 293 (7th Cir. 1993), the Seventh Circuit considered a case on all fours with the instant case. In that case, a defendant who faced a mandatory minimum sentence of 60 months under 21 U.S.C. § 841(b)(1)(B) obtained a downward departure motion from the government under 18 U.S.C. § 3553(e). The defendant claimed that § 3553(e) required that his resulting sentence fall within his sentencing guideline range of twenty-one to twenty-seven months. The court rejected this argument, finding instead that the defendant's resulting sentence of forty-seven months was imposed in accordance with the guidelines. In drawing this conclusion, the court pointed to language in USSG § 5G1.1(b) providing that "[w]here a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, *the statutorily required minimum sentence shall be the guideline sentence*." *Hayes*, 5 F.3d at 294-95. Based upon its interpretation of this language, the court held that "the statutory mandatory minimum sentence . . . became [the defendant's] guidelines range, albeit a narrow one." *Id.* at 295. The court therefore

*v. Hill*, 142 F.3d 305, 310 (6th Cir. 1998). But the circuits are split as to the proper standard of review of the denial of an evidentiary hearing under *Franks*. *See United States v. Fields*, No. 98-5798, 2000 WL 1140557, at **3 (6th Cir. Aug. 4, 2000); *United States v. Palladino*, No. 92-00072, 1994 WL 369139, at **4 n.4 (6th Cir. July 13, 1994); *United States v. Dale*, 991 F.2d 819, 843, n. 44 (D.C. Cir. 1993). In *Dale*, our sister circuit noted that four circuits employ clear error review for a denial of a *Franks* hearing--*United States v. Buchanan*, 985 F.2d 1372, 1378 (8th Cir. 1993); *United States v. Skinner*, 972 F.2d 171, 177 (7th Cir. 1992); *United States v. Hadfield*, 918 F.2d 987, 992 (1st Cir. 1990); *United States v. One Parcel of Property*, 897 F.2d 97, 100 (2d Cir. 1990)--and two circuits review *de novo*--*United States v. Homick*, 964 F.2d 899, 904 (9th Cir. 1992); *United States v. Mueller*, 902 F.2d 336, 341 (5th Cir. 1990), *denial of post-conviction relief vacated by* 168 F.3d 186 (5th Cir. 1999). However, as was the case in *Fields* and *Dale*, "the more exacting [*de novo*] standard of review is satisfied . . . and it is unnecessary for us to further discuss the issue." *Fields*, 2000 WL 1140557, at **3.

**B.**

In order to conduct electronic surveillance using a wiretap, federal law enforcement officials must secure authorization by making an application containing a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This statutory "necessity requirement" was designed to insure that "wiretapping is not resorted to in a situation in which traditional investigative techniques will suffice to expose the crime." *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988). Generally, a district court's finding that the requirements of § 2518(1)(c) have been met

are afforded "considerable discretion." *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977).

In *Franks*, the Supreme Court recognized a defendant's right to challenge the sufficiency of a previously issued and executed warrant by attacking the statements made in an affidavit in support of the warrant. In order to obtain a hearing, the defendant must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit. *Franks*, 438 U.S. at 155-56. If the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. *Id.* at 171. The defendant must specifically point to the disputed portions of the challenged affidavit, and must support these charges with an offer of proof. *Id.* If the defendant meets this burden, the court must then reconsider the affidavit without the disputed portions and determine whether probable cause still exists. If probable cause does not exist, the court must hold a full evidentiary hearing to determine whether the affidavit was properly submitted.

In the instant case, law enforcement officials alleged that wiretap surveillance was the only investigative technique reasonably likely to establish the full scope of the alleged criminal enterprise. In a 100-page affidavit, they provided a tremendous amount of information supporting this claim, including a statement as to the element of danger involved and specific investigative techniques that had been utilized, including confidential informants and cooperating witnesses, controlled purchases of drugs, consensual recordings, physical surveillance, and telephone records. Based upon this affidavit, the district court determined that the need for electronic surveillance had been established, fulfilling its duty under 18 U.S.C. § 2518(3)(c). Neither of the Benfords presented the district court with any affidavits to support their

reduced Lanxter's sentence, but the resulting sentence of ninety-two months imprisonment fell between the statutory minimum (120 months) and the upper end of the guideline range (seventy-one months). Lanxter now appeals that decision.

### A.

The government contends that Lanxter is challenging the extent of the court's downward departure, which would mean that we lack jurisdiction over his appeal. *See United States v. Gregory*, 932 F.2d 1167, 1169 (6th Cir. 1991) (holding that this Court "should not accept jurisdiction over appeals based on factors which the appellant argues should have influenced the degree of a downward departure" under 18 U.S.C. § 3553(e)). However, in the case at bar, Lanxter does not argue that certain factors should have led to a greater downward departure; rather, he challenges the method used to calculate the downward departure for substantial assistance. Section 3553(e) provides that, after the government files a downward departure motion authorizing the district court to "impose a sentence below a level established by statute as a minimum sentence . . . [, such] sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission . . . ." 18 U.S.C. § 3553(e). Lanxter's appeal asks us to determine whether, by using his 120 month mandatory minimum sentence as the starting point for its downward departure calculation, the district court ignored the language in § 3553(e) directing the court to rely upon the guidelines in calculating reduced sentences. This is an issue of law

---

depart below a statutory minimum. *See, e.g., United States v. Working*, 224 F.3d 1093 (9th Cir. 2000) (*en banc*); *United States v. Santiago*, 201 F.3d 185, 187 (3d Cir. 1999); *United States v. Polanco*, 53 F.3d 893 (8th Cir. 1995); *United States v. Brigham*, 977 F.2d 317, 320 (7th Cir. 1992); *United States v. Reynolds*, 215 F.3d 1210, 1215 (11th Cir. 2000).

(quoting *Owusu*, 199 F.3d at 349); *Bearden*, 274 F.3d at 1038. We believe that the district court recognized its discretion to depart downward, but based on the evidence presented to it, even in the aggregate, believed that such departure was unwarranted. We therefore may not review the district court's decision not to depart downward.

## VI. SENTENCING AFTER DOWNWARD DEPARTURE

The sole issue presented in Timothy Lanxter's appeal concerns the proper method of sentencing defendants who are granted downward departures from statutory minimum sentences. Although Lanxter's sentencing range under the guidelines was from fifty-one to seventy-one months, the district court's drug quantity calculation and Lanxter's previous felony drug conviction triggered a statutory minimum sentence of 120 months imprisonment under 21 U.S.C. § 841(b)(1)(B).[20] However, the district court departed below that statutory minimum upon a motion by the government pursuant to 18 U.S.C. § 3553(e) based upon the substantial assistance Lanxter provided to the government in the investigation of other suspects.[21] The district court

------

[20] At sentencing, the district court adopted the recommendation in the PSIR, which determined that Lanxter was responsible for 765.4 grams of powder cocaine. Lanxter has not asserted an *Apprendi* challenge on appeal.

[21] When a defendant faces a statutory minimum sentence, the district court's ability to depart downward below that minimum is limited to two provisions--18 U.S.C. § 3553(e), which allows for departures based upon the government's motion indicating that a defendant has provided substantial assistance in the investigation of other suspects, and 18 U.S.C. § 3553(f), which is known as the "safety valve" provision. In *United States v. Burke*, 237 F.3d 741, 743 (6th Cir. 2001), we recognized that all of the courts that have addressed the issue have determined that these two provisions represent the exclusive means by which a district court may

claim that the affidavit was false in any respect. Instead, they merely argued that electronic surveillance was not necessary under the circumstances because other law enforcement techniques were successful and the two major co-conspirators who were purported to be dangerous were not even charged in the case. This Court has explained:

> A defendant who challenges the veracity of statements made in an affidavit that formed the basis for a warrant has a heavy burden. His allegations must be more than conclusory. He must point to specific false statements that he claims were made intentionally or with reckless disregard for the truth. He must accompany his allegations with an offer of proof. Moreover, he also should provide supporting affidavits or explain their absence. If he meets these requirements, then the question becomes whether, absent the challenged statements, there remains sufficient content in the affidavit to support a finding of probable cause.

*United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citations omitted).

In addition to being conclusory, the Benfords' arguments are simply wrong as a matter of law. In endeavoring to secure a wiretap warrant, the government need not prove the impossibility of other means of obtaining information. Instead, the necessity provisions merely require that law enforcement officials "give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985). This precise information was provided in the instant case. *See United States v. Cooper*, 868 F.2d 1505, 1508-09 (6th Cir. 1989) (holding that undercover operations including controlled purchases, consensual

telephone monitoring, and physical surveillance established that "normal investigative procedures" had been extensively conducted, and that the requested interception of wire and oral communications was not "employed as the initial step in criminal investigation").

Furthermore, the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance. We have previously recognized that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (quoting *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir. 1975)). The evidence reflects that various members of the drug conspiracy facilitated the criminal enterprise through multiple telephone conversations from several locations. In addition, it does not appear that the government could have uncovered the full scope of the conspiracy, especially not in a relatively safe manner, without the wiretaps. By the time the electronic surveillance began in this case, the investigation had been going on for approximately three years. Yet, the surveillance permitted authorities to discover numerous additional participants in this far-reaching conspiracy. The Benfords have provided no evidence to contest the government's contention that traditional methods would have been dangerous. The fact that two individuals whom the government particularly feared were not eventually indicted is not relevant to this determination. *Cf. United States v. Guerra-Marez*, 928 F.2d 665, 671 (5th Cir. 1991) ("The government could have reasonably concluded that attempting to elicit further information . . . would have aroused the suspicions of other participants, thus endangering both its informant and the investigation.").

evidence before it, not to depart downward. "A district court judge has no duty 'to state affirmatively that he knows he possesses the power to make a downward departure, but declines to do so.'" *Owusu*, 199 F.3d at 349 (citing *United States v. Byrd*, 53 F.3d 144, 145 (6th Cir.1995)). After considering Rossell's arguments concerning his rehabilitative efforts, the district court explained:

> So with respect to the drug rehab, I mean, it's certainly commendable that the defendant has gone to, gone and sought treatment, it will certainly help him as time goes on if he maintains that. And I hope he does. But I don't think it's extraordinary. We have many people who once they get caught go into drug rehab. And I'm always glad to see it, but I don't think it warrants a downward departure. And, certainly, in this case it does not justify a downward departure. And in any event even if it was extraordinary, I do not believe it would warrant a sentence below the mandatory-minimum without a motion by the government under 3553(e).

(J.A. at 1394).

Defense counsel later argued that considering the combination of factors a downward departure was justified. Defense counsel stated "we respectfully request that you do have the authority under 5K2.0 to make a sentence less than the guidelines." (J.A. at 1396.) To that, the district court responded "[w]ell, I've not been made aware of anything that would warrant a downward departure for a sentence less than the guidelines collectively or individually." (J.A. at 1396-97.) "[A]n appellate court should be reluctant to treat as ambiguous a ruling which does not affirmatively state that the judge knew he could depart downward but failed to do so. We should therefore assume that a district court is exercising its proper discretion when it concludes that a downward departure is unwarranted." *McGahee*, 257 F.3d at 531-32

significance, when considered in the aggregate, of mitigating factors that he alleges warranted a downward departure under the Sentencing Guidelines. We review a district court's decision to grant a downward departure for abuse of discretion. *United States v. McGahee*, 257 F.3d 520, 531 (6th Cir. 2001). However, this Court has "consistently held that the decision by a district court not to depart downwards from the Guidelines is not reviewable on appeal unless the record reflects that the district court was not aware of or did not understand its discretion to make such a departure." *United States v. Bearden*, 274 F.3d 1031, 1038 (6th Cir. 2001) (quoting *United States v. Butler*, 207 F.3d 839, 843 (6th Cir. 2000)); *McGahee*, 257 F.3d at 531 (explaining that only where the district court incorrectly believed that it lacked discretion to depart may we review the district court's decision not to depart downward) (citing *United States v. Coleman*, 188 F.3d 354, 357 (6th Cir.1999) (*en banc*)); *United States v. Brown*, 66 F.3d 124, 128 (6th Cir. 1995) (same).

Rossell argues that a downward departure was warranted because (1) he made extraordinary efforts toward rehabilitation from alcohol and drug dependence; (2) he cooperated with the government by providing substantial information regarding his activities and the activities of others; (3) he was subjected to an enhanced minimum sentence for 120 months in prison due to two prior felony convictions, which occurred more than 22-years earlier; (4) the amount of drugs attributed to him was overstated; and (5) the loaded handgun used to enhance his sentence under USSG § 2D1.1(b)(1) was voluntarily revealed and was possessed for sentimental reasons.

The government counters that the district court's decision not to grant a downward departure is unreviewable in this case inasmuch as the district court considered all of the arguments Rossell now raises and decided based on the

For these reasons, we hold that the district court did not err in declining to hold a *Franks* hearing or by determining that the evidence was sufficient to satisfy the government's obligation to show necessity for electronic surveillance under § 2518(1)(c).

## II. "REASONABLE DOUBT" JURY INSTRUCTIONS

Nathan Benford also claims on appeal that the jury instructions delivered at his trial regarding the "reasonable doubt" standard were flawed. This Court reviews jury instructions as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach its decision. *Innes v. Howell Corp.*, 76 F.3d 702, 714 (6th Cir. 1996). We may reverse the district court only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial. *Id.*

The district court instructed the jury, in part, as follows:

> Proof beyond a reasonable doubt means proof which is so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own lives. If you are convinced that the government has proved the defendant guilty beyond a reasonable doubt, say so by returning a guilty verdict. If you are not convinced, say so by returning a not guilty verdict.

At trial, the district court denied Benford's request to delete the first sentence of the above-quoted paragraph. Without citing any relevant legal authority, Benford now claims that the jury instructions should not have included that sentence because it dilutes the reasonable doubt standard thereby violating the Due Process Clause of the Fifth Amendment. He notes that several courts have discouraged any attempt to define "reasonable doubt" due to the difficulty of such a task.

However, there is no indication that the jury instructions are confusing. *See Holland v. United States*, 348 U.S. 121, 140 (1955) (suggesting that jury instructions of reasonable doubt should be stated "in terms of the kind of doubt that would make a person hesitate to act, rather than the kind on which he would be willing to act," but "the instruction as given was not of the type that could mislead the jury into finding no reasonable doubt when in fact there was some") (internal citations omitted). Moreover, the contested language is taken verbatim from this Circuit's Pattern Jury Instructions, which have not been held to be unconstitutional. *See* Pattern Jury instructions, 6th Cir. 1.03, 1991 Ed. We therefore hold that the jury instructions were not flawed.

### III. WITHDRAWAL OF GUILTY PLEA

Defendant Tramble seeks to vacate his plea of guilty to the charge of aiding and abetting money laundering in violation of 18 U.S.C. § 1956(A)(1)(i). Inasmuch as he did not raise this issue before the district court, and even now does not claim that his plea was not knowing and voluntary, we review the court's acceptance of Tramble's plea for plain error. FED. R. CRIM. P. 52 (b). *Cf. United States v. Timbana*, 222 F.3d 688, 701 (9th Cir. 2000) (holding that voluntariness of a guilty plea is reviewed *de novo* even if a defendant fails to move to vacate a judgment or withdraw his guilty plea before the district court). The authority created by Rule 52(b) is circumscribed. There must first be an error, and, second, that error must be considered "plain". In addition, the "plain error" must affect a defendant's substantial rights. If all three factors are present, we must determine whether this is an appropriate case in which to exercise our discretion to correct the forfeited error, because the error threatens the basic fairness, integrity, or public reputation of the district court proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Hayes*, 171 F.3d 389, 391-92 (6th Cir. 1999); *United States v. Koeberlein*, 161 F.3d 946, 949

on the premises, including times when the drugs were being dealt out of the store. Robinson also testified that when Tramble came to the store, he would often bring along a .357 magnum and ask Stewart or Robinson to "put it up" for him. After hearing all of the evidence, the district court found that the firearms were present at the time Stewart and the others were engaged in cocaine transactions. We agree. As a person operating the store, Stewart had constructive possession of the weapons. She argues, however, that she did not have constructive possession because she did not have dominion and control over the premises where the firearms were located at the time the search warrant was issued and executed. However, Brydie testified that Stewart worked at the store every day from approximately six o' clock in the morning until six o' clock at night. As the manager of the store who was present for so much of the day, who knew where the weapons were located and who was involved with distributing drugs from the store, it is inconceivable that Stewart did not have dominion and control over the weapons during the drug trafficking activity. *Hill*, 79 F.3d at 1485. In addition, Stewart may be held responsible for the possession of the guns by her co-defendants because it was reasonably foreseeable that they possessed the weapons in connection with the drug conspiracy. This is particularly true with regard to Tramble, inasmuch as there was evidence at Stewart's sentencing hearing that she assisted him in distributing drugs, and that he would often instruct her to put away his gun when he was in the store. Therefore, the district court did not clearly err in enhancing Stewart's base offense level by two-points pursuant to USSG § 2D1.1(b)(1).

### B.

Rossell also appeals the district court's denial of his motion for a downward departure of his sentence for "exceptional circumstances" under USSG § 5K2.0. Defendant claims that the district court failed to appreciate the exceptional

found next to cash proceeds and in close proximity to his cellular phone, which Mrs. Benford had herself used, and which wiretap recordings revealed had been used to facilitate and conceal drug transactions. Because Mrs. Benford knew the gun was in her home and admits that her husband was in possession of the weapon, it was reasonably foreseeable to her that her husband would use it in furtherance of the drug conspiracy. Indeed, in her brief she contends that it is highly probable that her husband possessed the gun. Thus, it is certainly not clearly improbable that he used the weapon to secure the cocaine trade during shipment and to protect the cash proceeds from its sale, and as stated, that his activity was reasonably foreseeable to her.

Finally, Stewart also contests the district court's imposition of a two-level enhancement to her base offense level as a result of its finding that she possessed a firearm in connection with her drug trafficking offense. On June 5, 1998, officers searched the S&S Market, the store owned by her father and which she managed. The officers recovered a .25 caliber handgun loaded with two rounds of ammunition, a .357 magnum revolver with five rounds of ammunition, and a .22 caliber rifle with one round of ammunition. Officers also found 15.6 grams of crack in the store. Stewart contends that there was no evidence that she had actual or constructive possession of the weapons, or that she even had any knowledge that they were on the premises. These contentions lack any merit.

Stewart admitted that she knew the handguns were in the store and kept under the counter, which is where drugs were kept. Co-Defendant Ossie "Jackie" Brydie worked at the S&S Market until the time the co-defendants were arrested. Brydie testified that she, Stewart and co-defendants Jeffrey Robinson, and Tramble, were all involved in distributing drugs from the S&S Market for between one and two years. Brydie also testified that the guns recovered were frequently

(6th Cir. 1998), *cert. denied*, 119 S. Ct. 1278 (1999). After reviewing Tramble's arguments, we find no error in his conviction.

Tramble does not contest his actual guilt or the validity of his guilty plea on the charge of aiding and abetting money laundering. Yet, he claims that the money laundering charge should have been dismissed from the indictment because his co-defendant, Carolyn Millard, whom Tramble labels the "principal" perpetrator, was acquitted on this count after a jury trial. Tramble acknowledges that he asks this Court to establish a new legal rule holding that courts should dismiss the indictment of a defendant who pleads guilty prior to or after his co-conspirator is acquitted of the same offense by a jury. However, by Tramble's own admission, there is no legal precedent that supports his claim.

It is irrelevant that Tramble characterizes Carolyn Millard as the "principal" in the offense. Under 18 U.S.C. § 2, any individual who either engages in or aids, abets, counsels, commands, induces, or procures conduct violating a federal criminal statute is punishable as a "principal". "As such, they are punishable for their criminal conduct; the fate of other participants is irrelevant." *Standefer v. United States*, 447 U.S. 10, 20 (1980). In *United States v. Yost*, 24 F.3d 99 (10th Cir. 1994), our sister circuit has recognized that because the statute treats aiding and abetting as principal liability, "there is no requirement that a de facto principal be convicted of an offense prior to convicting someone as an aider and abettor, nor is there even a bar to prosecuting someone as an aider and abettor after an alleged de facto principal is acquitted." *Id.* at 104 n.4 (citing *Standefer*, 447 U.S. at 15-20).

In light of this legal precedent, we hold that the district court did not commit error by declining to vacate Tramble's plea of guilty. We also note that, even if his conviction did constitute error, the error could not have affected his

substantial rights because Tramble does not deny the validity of the factual basis for his guilty plea. His conviction could not therefore undermine the fairness or integrity of the district court proceedings.

## IV. *APPRENDI* CHALLENGES TO DRUG CONSPIRACY SENTENCES

Defendants Nathan Benford, Rena Benford, Calvin Tramble, Suzette Miranda Stewart, and Charles Rossell argue on appeal that the district court committed constitutional error under *Apprendi* by sentencing them to terms of imprisonment and supervised release based upon the court's finding of drug quantities by a preponderance of the evidence. We are first called upon to clarify the proper method of preserving *Apprendi* claims prior to the time that case was decided. We begin with a brief recitation of the development of *Apprendi* jurisprudence in this Circuit. We will then apply those decisions to Defendants. And finally, we will determine whether, to the extent *Apprendi* error has occurred, such error was harmless.

### A.

In *Jones v. United States*, 526 U.S. 227, 248 (1999), the Supreme Court suggested possible violations of the Fifth Amendment's Due Process Clause and the Sixth Amendment's notice (indictment) and jury trial guarantees stemming from the "diminishment of the jury's significance by removing control over facts determining a statutory sentencing range." *Jones* had been decided at the time Defendants were sentenced. After all of the judgments were entered, however, the Supreme Court decided *Apprendi*, which confirmed the suggestion in *Jones* that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

Authorities also seized more than $20,000 in cash, which Mrs. Benford has not denied was connected to her drug activity. In an agreed order of forfeiture, the government confiscated the $20,000 along with other property owned by the Benfords. She also does not contend that she did not know that the firearm was present in the house. Further, recorded conversations revealed that the residence was used to collect drug money related to the drug trafficking offense. The government contends that these facts sufficiently show that the weapon was jointly possessed by both of the Benfords and was used to protect themselves and their drugs proceeds. The government alternatively argues that even if Mrs. Benford did not actually possess the gun, the two-level enhancement was proper because she could reasonably foresee her husband's possession of the gun during and in connection with the drug conspiracy. We believe the government prevails under either theory.

Mrs. Benford, at a minimum, had constructive possession over the weapon, which is established if the evidence shows that she had ownership, dominion, or control over the weapon. *Owusu*, 199 F.3d at 347. Mrs. Benford does not deny that she knew that the loaded weapon was in her bedroom dresser drawer. She also cannot deny that currency related to her drug trafficking offense was found in the same location as the weapon. Under these fact, it is not clearly improbable that the weapon was related to her drug trafficking offense. Further, in a conspiracy, the government does not have to show that the defendant was in actual or constructive possession of the weapon in order for the enhancement to apply. The enhancement is proper where it was foreseeable to a defendant that her coconspirator would possess the weapon in connection with his or her drug trafficking activity. *Id.* Prior to sentencing Mrs. Benford, the district court applied the same two-level enhancement to her husband, Nathan. It was clear that he possessed the gun in connection with drug trafficking because the weapon was

Mrs. Benford contends that the two-level enhancement for possession of a firearm was improper because when authorities searched her home, they found no cocaine or cocaine paraphernalia. When authorities executed a search warrant of the Benfords' residence they found a loaded 9 millimeter pistol in the master bedroom dresser drawer.

---

846 or other enumerated statutes shall be sentenced without regard to any statutory minimum sentence if the defendant meets five criteria. One of those criterion is that the "defendant did not use violence *or possess a firearm* or other dangerous weapon (or induce another participant to do so) *in connection with the offense* . . . ." USSG § 5C1.2.(2) (emphasis added). The defendant bears the burden of showing eligibility for the safety valve by a preponderance of the evidence. *United States v. Salgado*, 250 F.3d 438, 459 (6th Cir. 2001) (citation omitted). Every circuit thus far that has considered the issue has held that where a defendant had actual or constructive possession over a firearm such that an increase to his or her base offense level under § 2D1.1 is appropriate, such possession "defeats application of the safety valve." *United States v. Smith*, 175 F.3d 1147, 1149 (9th Cir. 1999) (collecting cases). Indeed in an unpublished decision, we have indicated the same. *See United States v. Bursey*, Nos. 99-1006, 99-1011, 2000 WL 712377, at *4 (6th Cir. May 23, 2000) (explaining that "constructive or actual possession of a firearm by a defendant will prevent application of the safety valve"). At Rossell's sentencing hearing, the district court considered application of the safety valve separately from the two-level enhancement under § 2D.1.1(b)(1), and found as to the safety valve provision that Rossell had failed to show by a preponderance of the evidence that the gun was not used in connection with his drug offense. Similar to his argument with respect to the § 2D1.1 enhancement, Rossell contends that the evidence shows that he possessed the gun for sentimental reasons inasmuch as it was a gift from his father and intended for his son for sometime in the future. However, as the district court found, if the gun were truly kept for only "sentimental" reasons and intended for his son, Rossell fails to explain why it was loaded and stashed under his own mattress. We have already concluded that the district court did not clearly err in finding that Rossell possessed the .38 caliber revolver in connection with his drug trafficking offense for purposes of § 2D1.1. We also believe that the district court did not err in finding that Rossell failed to show by a preponderance of the evidence that he was eligible for the safety valve provision under § 5C1.2(2). *Salgado*, 250 F.3d at 459.

530 U.S. at 490.[2] The Court dismissed the then common argument that an enhancing fact may be considered merely a "sentencing factor" and instead held that "the relevant inquiry is not one of form but of effect--does the required finding *expose the defendant to a greater punishment than that authorized by the jury's guilty verdict*?" 530 U.S. at 494 (emphasis added).

In the instant case, Defendants were sentenced under the subsections of 21 U.S.C. § 841(b). This statute creates a three-tiered sentencing system based upon drug quantities. Defendants face a sentence of five to forty years under 21 U.S.C. § 841(b)(1)(B) if they are responsible for between 5 and 50 grams of "cocaine base" or between 500 grams and 5 kilograms of cocaine hydrochloride (powder cocaine). Under 21 U.S.C. § 841(b)(1)(A), defendants face a minimum sentence of ten years and a maximum of life imprisonment if they are connected to 50 grams or more of cocaine base or 5 kilograms or more of cocaine hydrochloride.[3] However,

---

[2]In *Apprendi*, the defendant had been convicted in a New Jersey court of possession of a firearm for an unlawful purpose, an offense punishable by imprisonment for between five to ten years. At his sentencing hearing, the district court judge found by a preponderance of the evidence that the defendant had committed the crime with a purpose to intimidate individuals because of their race. Under New Jersey's hate crime law, this finding increased the defendant's sentence to imprisonment beyond the statutory maximum for the crime for which he was found guilty. The claim in *Apprendi* was under the Due Process Clause of the Fourteenth Amendment; the analogous Due Process Clause of the Fifth Amendment applies in the instant case.

[3]The maximum penalties under subsections 841(b)(1)(A) and (B) are more severe if certain aggravating factors are present, such as being a prior felony drug offender, or if the use of the controlled substances results in death or serious bodily injury. The fact of a prior conviction was specifically excluded from the scope of the Supreme Court's decision in *Apprendi*.

where no amount of drugs is specified in the indictment or determined by the jury beyond a reasonable doubt, subsection 841(b)(1)(C) provides the default maximum penalties of twenty years, or thirty years in the case of a repeat felony drug offender. 21 U.S.C. § 841(b)(1)(C).

In *United States v. Rebmann*, 226 F.3d 521, 524 (6th Cir. 2000)[4], and *United States v. Page*, 232 F.3d 536 (6th Cir. 2000), we determined that "[p]ursuant to the provisions of § 841, the quantity of drugs is a factual determination that significantly impacts the sentence imposed." *Page*, 232 F.3d at 543. In addition, in *United States v. Ramirez*, 242 F.3d 348, 351 (6th Cir. 2000), we determined that the government must name in the indictment the quantity of drugs for which it seeks to hold a defendant responsible under 21 U.S.C. § 841(a) if it seeks an enhanced sentence based on drug quantity. We further explained in *United States v. Strayhorn*, 250 F.3d 462 (6th Cir. 2001), that "each penalty provision of § 841(b) constitutes a different crime with different elements, including drug weight which must be proved beyond a reasonable doubt when sentencing a defendant in excess of the default statutory maximum set out in § 841(b)(1)(C) for all drugs except marijuana . . . ." *Id.* at 468.

In the instant case, the indictment did not specify the drug quantity attributable to each Defendant. With respect to the Benfords, the district court never instructed the jury to

---

[4] In *Rebmann*, a defendant pleaded guilty to distribution of heroin in violation of 21 U.S.C. § 841. The guilty plea exposed the defendant to a maximum sentence of twenty years; but § 841 requires a factual determination as to whether the offense involved death or serious bodily injury, which would increase the maximum sentence to life imprisonment. 21 U.S.C. § 841(b)(1)(A). The district court determined that these criteria were met and sentenced the defendant to life imprisonment. Because this factual determination increased the defendant's maximum, it was made in violation of *Apprendi*.

that the firearm was connected to the crime. He contends that he had given the gun to his father as a gift and that upon his father's death, the gun was returned to Rossell so that he could give it to his own son once the boy turned 18 years old. Rossell argues that the district court erred in finding that there was a nexus between his drug offense and the revolver because the affidavit in support of the warrant to search his home did not mention a firearm, no cocaine was found inside his home, and none of his co-conspirators indicated that he had brandished a firearm. However, the facts of the instant case reflect that there was a sufficient nexus between the firearm and the drug activity. The loaded firearm, which as a convicted felon Rossell should not have had in the first place, was in Rossell's bedroom. Marijuana was also found in the bedroom closet. Rossell admitted that he would trade marijuana to his cocaine suppliers in order to obtain a discounted price. Further, officers found plastic baggies and scales, items often used in the illegal drug trade, in Rossell's garage. Rossell and his wife also admitted, and wiretap recordings confirm, that drug transactions were arranged from the residence. Moreover, Rossell admitted that he had stored ten ounces of powder cocaine outside of his residence in a picnic table. The district court rejected Rossell's argument that he kept the weapon for sentimental reasons. The court noted that the gun was loaded, kept under Rossell's mattress, drugs and drug paraphernalia were found in and/or around the residence, and that drug-related activity had occurred at the residence. Under these facts, Rossell has not met his burden of showing that it was clearly improbable that the weapon was connected to his drug trafficking offense. *Hill*, 79 F.3d at 1485.[19]

---

[19] We also believe that Rossell has failed to meet his burden of showing that he was entitled to a reduction in his sentence pursuant to the safety valve provision of USSG § 5C1.2. Under that provision of the Sentencing Guidelines, a defendant convicted under 21 U.S.C. §§ 841,

**A.**

"A district court's finding that a defendant possessed a firearm during a drug crime is a factual finding subject to the clearly erroneous standard of review." *United States v. Elder*, 90 F.3d 1110, 1133 (6th Cir. 1996) (citations omitted). The Sentencing Guidelines provide that the base offense level of a defendant convicted of a drug offense should be increased by two levels "[i]f a dangerous weapon (including a firearm) was possessed." *United States v. Owusu*, 199 F.3d 329, 347 (6th Cir. 2000) (citing USSG § 2D1.1(b)(1)). To apply the enhancement, the government must establish that (1) the defendant actually or constructively "possessed" the weapon; and (2) that such possession was during the commission of the offense. *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir.), *cert. denied*, 519 U.S. 858 (1996). "Once it is established that a defendant was in possession of a weapon during the commission of an offense, a presumption arises that such possession was connected to the offense." *Id*. The burden then shifts to the defendant to show that "it was clearly improbable that the weapon was connected to the offense." *Id*. (citing USSG § 2D1.1, comment. (n.3)). "Constructive possession of an item is the 'ownership, or dominion or control' over the item itself, 'or dominion over the premises' where the item is located." *Id*. (citation omitted). "If the offense committed is part of a conspiracy, however, the government does not have to prove that the defendant actually possessed the weapon, but instead may establish that a member of the conspiracy possessed the firearm and that the member's possession was reasonably foreseeable by other members in the conspiracy." *Owusu*, 199 F.3d at 347 (citation omitted).

Authorities found a .38 caliber revolver loaded with six hollow point rounds stuffed between Rossell's mattress and box spring. Rossell does not contend that he did not possess the firearm, but rather that the district court erred in finding

determine the drug amounts; rather, the jury merely found that Defendants had conspired to distribute and possess some undetermined amount of crack cocaine. Similarly, the plea agreements entered by Tramble and Rossell also failed to specify drug quantities. However, the district court found, by a preponderance of the evidence, the quantity of drugs for which each Defendant was accountable. The court then used these drug quantities to sentence the Defendants to various terms of imprisonment and supervised release under the subsections of 21 U.S.C. § 841(b). Below, we will discuss whether any claimed *Apprendi* error warrants vacating any of the Defendants' sentences.

**B.**

The parties dispute the appropriate method of preserving an *Apprendi* challenge and, therefore, the applicable standard of review. The government characterizes Defendants' *Apprendi* claims as alleging an omission from a jury instruction and contends that their claims should be reviewed only for plain error because they did not object to the drug amounts until after the jury returned its verdict. In support of this argument, the government cites FED. R. CRIM. P. 30, which provides that a party may not "assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict . . . ." However, this rule is inapplicable in the instant case because an *Apprendi* violation can occur outside of the context of an omission of an element of a crime from the jury charge. For instance, we have held that an *Apprendi* issue might arise when a defendant pleads guilty to a drug offense just as it might when he chooses to take his case to trial. *Strayhorn*, 250 F.3d at 468 (citing *United States v. Harper*, 246 F.3d 520, 530-31 (6th Cir. 2001)). We explained our basis for applying *Apprendi* to guilty pleas as follows:

Our rationale is simple: the defendant who pleads guilty to an unspecified amount of drugs and is then sentenced under the preponderance-of-the-evidence standard may just as easily be subjected to an enhanced sentence in excess of the default statutory maximum as the defendant who takes his case to trial and is then sentenced by the district court under the same preponderance-of-the-evidence standard. This holding follows inexorably from [*United States v. Flowal*, 234 F.3d 932 (6th Cir. 2000)], *Ramirez*, and *Harper*, and its outcome is dictated by *Apprendi*.

*Strayhorn*, 250 F.3d at 468. Therefore, the jury instruction analogy must fail.

We also emphasize that the constitutional error likewise does not lie in the indictment itself. The government's failure to allege a drug quantity does not render a drug distribution indictment constitutionally infirm. *See Hamling v. United States*, 418 U.S. 87, 117 (1974) ("[An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."). Instead, when specific quantities are not alleged, a defendant should be sentenced under 21 U.S.C. § 841(b)(1)(C), which establishes the default statutory maximum sentences and does not require as an element of the offense a specific quantity of drugs. *See Page*, 232 F.3d at 543 (holding that because indictment failed to mention drug quantity and no such quantity was found by the jury, defendants could only be subjected to the penalties prescribed under § 841(b)(1)(C)). Thus, it would be imprudent for defense counsel to object to an indictment which, by all rights, is facially sound. To do so would be in direct opposition to his client's penal interests; the only logical outcome of such a challenge would be for the government to

might have posed different questions or attacked witness testimony regarding her involvement in drug trafficking in ways that might have raised sufficient doubt in juror's minds regarding the exact quantities of drugs that Mrs. Benford was charged with cooking or transporting, etc. *See Jordan*, 291 F.3d at 1095-96. Determining whether the jury would have reached the same results as the district court on this record would be speculative at best. Because I cannot find that the *Apprendi* error in Mrs. Benford's case was harmless beyond a reasonable doubt, I would vacate Mrs. Benford's sentence and remand her case to the district court for re-sentencing under 21 U.S.C. § 841(b)(1)(C).[18]

### V. POSSESSION OF FIREARMS AND DOWNWARD DEPARTURE FOR EXCEPTIONAL CIRCUMSTANCES

Rossell, Mrs. Benford, and Stewart contend that the district court erred in enhancing their sentences by two points pursuant to USSG § 2D1.1 for possession of a firearm during the commission of their crimes. Rossell also argues that the district court erred in determining that he was not eligible for the safety valve provision of USSG § 5C1.2(2) and in failing to depart downward due to the exceptional circumstances surrounding his case. For the reasons explained below, we reject each of these arguments.

---

[18]Although the evidence at the Benfords' trial may have established that the overall conspiracy contained quantities of drugs that would permit affirming a sentence imposed under 21 U.S.C. § 841(b)(1)(A) or (b)(1)(B), we have held that *Apprendi* requires that a defendant is entitled to have drug quantity charged in the indictment and proved beyond a reasonable doubt where his or her sentence exceeds that prescribed by § 841(b)(1)(C). *See Neuhausser*, 241 F.3d at 465-66. *Apprendi* is clearly implicated in Mrs. Benford's case, and I do not find the error to be harmless beyond a reasonable doubt based on the record. Therefore, I would find that she is entitled to be re-sentenced.

testimony regarding Mrs. Benford's actual involvement with drugs was minimal compared to her husband. As her counsel noted at sentencing, he would go a day or two at trial without cross-examining witnesses because Mrs. Benford was not mentioned. (J.A. at 1513.) The district court based Mrs. Benford's sentence largely on testimony that she offered to assist counting money earned from selling a kilogram of cocaine; placed money in a safe located in Uptown Supper Club that according to Hilt, he and Mr. Benford planned to later use to buy a kilogram of cocaine powder; and helped transport 500 grams of crack on one occasion. Billingsley also testified that he witnessed Mrs. Benford cook cocaine into crack on one occasion. I cannot on this record, with so few references to Mrs. Benford's actual involvement with the drug amounts in this vast conspiracy, determine beyond a reasonable doubt that the grand jury would have indicted her for conspiracy to possess 50 grams or more of crack or five kilograms of cocaine. *See Jordan*, 291 F.3d at 1095-96. More importantly, inasmuch as Mrs. Benford had no notice that drug quantity was an issue at trial, there is no way of knowing whether she would have contested drug quantity, and if so, of assessing the evidence that she would have presented contesting quantity. I therefore cannot find based on the present record that the failure to allege drug quantity in the indictment or to have the jury determine drug quantity beyond a reasonable doubt was harmless beyond a reasonable doubt. *Id*. Contrary to the government's arguments, it is not enough that there might be some evidence in the record that might permit affirming the sentence the district court imposed in Mrs. Benford's case. Rather, in determining whether Mrs. Benford's substantial rights were affected, the evidence must be *overwhelming* and essentially uncontroverted. *See Neder,* 527 U.S. at 19; *Candelario*, 240 F.3d at 1308 (emphasis added). Further, the Court must be convinced that the record evidence could not lead to a contrary finding with respect to the element omitted. *Id*. Had Mrs. Benford realized that drug quantity would be an issue at trial, she through her counsel

replace the charge under 21 U.S.C. § 841 with a more specific charge, specifically alleging a drug quantity, which might expose the defendant to a higher statutory penalty range. Instead of objecting to a valid indictment or jury instruction, the proper time for a defendant to raise a challenge to his sentence is at the time the actual violation occurs--at the time of sentencing. *See United States v. Jackson*, 240 F.3d 1245, 1248 (10th Cir. 2001) ("The error . . . is best characterized as sentencing in excess of the statutory maximum penalty applicable to the offense of conviction.").

The government also claims that all of the Defendants have failed to preserve their *Apprendi* challenges by not raising them before the district court at the time of sentencing. While we disagree with the government as to the Benfords' *Apprendi* challenge, we agree that the remaining Defendants failed to preserve their claimed error for appeal, and we will review any error they raise only for plain error. Most circuits have held that to preserve an *Apprendi* challenge for purposes of appeal, a defendant must raise some sort of *constitutional* objection before the district court. *See, e.g., United States v. Candelario*, 240 F.3d 1300 (11th Cir. 2001) (distinguishing between the "evidentiary objection" of challenging drug quantities in a presentence investigation report and a formal constitutional objection that the drug quantity must be determined beyond a reasonable doubt under *Apprendi* or *Jones*). However, this Court has held that a defendant's "repeated" objection to the method of drug calculation below suffices to preserve *Apprendi* error on appeal. *See United States v. Strayhorn,* 250 F.3d 462, 467 (6th Cir. 2001).

Specifically, in *Strayhorn*, we considered the appropriate standard of review for the case of a defendant who brought a seemingly belated constitutional challenge to his sentence on direct appeal. *Apprendi* was decided after the Defendant's sentencing hearing and subsequent to briefing on appeal. Thus, he raised the constitutional challenge to his sentence for

the first time at oral argument. We dismissed the notion that the constitutional issue had been waived and instead held that, because the defendant was asserting a new constitutional rule that was decided while his case was pending, *Apprendi* should apply retroactively to his case. *Strayhorn*, 250 F.3d at 467 (citing *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) (holding that appellate courts should apply the new constitutional rules retroactively to cases still on direct review). We further found that, because the defendant had steadfastly challenged the district court's drug quantity determination and the amounts attributed to him in the presentence investigation report ("PSIR"), his failure to articulate a constitutional challenge at trial did not require application of the plain error standard of review:

> [T]he record makes plain that Strayhorn preserved his [constitutional] challenge by repeatedly objecting to the drug quantity determination at his plea hearing and at his sentencing hearing, as *well as in a written objection to the calculation of his base offense level in his presentence report*. Although he did not utter the words 'due process' at either of these hearings, he made it well known that he disputed the district court's factual finding with respect to drug quantity.

*Strayhorn*, 250 F.3d at 467 (emphasis added). Based upon this reasoning, we reviewed the defendant's constitutional challenge *de novo*. *Id.* (citing *United States v. Lloyd*, 10 F.3d 1197, 1120 (6th Cir. 1993) (holding that constitutional challenge to sentences presents a question of law requiring *de novo* review)).

This Court's most recent explication of preserving *Apprendi* challenges is found in *United States v. Humphrey*, 287 F.3d 422 (2002). In that case, much like *Strayhorn*, the defendant did not rely on *Apprendi* in challenging his sentence before the district court, and indeed could not have

he witnessed Benford possessing other quantities of cocaine, including a kilogram of cocaine powder that Benford distributed to Billingsley and to others. Co-defendant Tracy Ellis testified that she stored drugs in her apartment for Benford. Pursuant to a search warrant, police recovered 408.2 grams of crack and 148.5 grams of cocaine hydrochloride from Ellis's apartment. After reviewing the presentence report, which recounted the above-cited events regarding Benford's cocaine dealings and numerous others, the district court found that more than 3,000 grams of crack and 6,000 grams of cocaine hydrochloride were properly attributable to Benford. We have no doubt based on this uncontroverted evidence that a jury would have found beyond a reasonable doubt that Benford was involved with quantities of drugs well above the requisite amounts needed for sentencing under § 841(b)(1)(A). *See Sanchez*, 269 F.3d at 1273 (explaining that omission from a § 841 indictment is similar to the jury instruction error in *Neder* inasmuch as part of the defendant's argument is that quantity must be charged so that "it can be submitted to the jury and proven beyond a reasonable doubt"). Therefore, we believe that the *Apprendi* error in Benford's case was harmless beyond a reasonable doubt. *Neder*, 527 U.S. at 8.

However, unlike the panel majority on this issue, I believe Mrs. Benford's case presents a different matter. Mrs. Benford's guideline range under the Sentencing Guidelines was 290 to 365 months. The district court concluded that "being hypersuperconservative," the quantity of drugs attributable to Mrs. Benford fell within the statutory range of 21 U.S.C. § 841(b)(1)(B), although her judgment indicates that she was actually sentenced under the higher provisions of § 841(b)(1)(A). (J.A. at 366-72.) The government also argues on appeal that the evidence was sufficient to show Mrs. Benford's involvement with quantities of crack cocaine and cocaine hydrochloride to support a sentence under § 841(b)(1)(B). However, a review of the record shows that

would have done. Under this circuit's jurisprudence, there may be instances where a court might find that a defendant's substantial rights were not affected although drug quantity was neither alleged nor proved beyond a reasonable doubt. *See King*, 272 F.3d at 379-80; *see also Sanchez*, 269 F.3d at 1272 (holding that harmless error review is appropriate where drug quantity is neither alleged in the indictment nor proven beyond a reasonable doubt). Further, it appears that in *Jordan*, the only evidence regarding drug quantity was 349.9 grams of methamphetamine that authorities found on property leased to the defendant. *Id*. at 1093.

In the instant case, however, Nathan Benford not only fails to challenge the amount of drugs attributed to him, but also the uncontroverted evidence--witness testimony and otherwise--presented at trial shows that Benford trafficked in quantities far above the 50 grams of crack cocaine or 5 kilograms of cocaine powder required for sentencing under 21 U.S.C. § 841(b)(1)(A). Numerous witnesses testified that they had been involved with Benford in distributing kilogram quantities of cocaine or storing large quantities of crack cocaine for him. Benford even stipulated to the quantities of some of these drugs, such as the 1,369 grams of crack that co-defendant Eddie Joe Mitchell testified that he retrieved at Benford's direction. Myron Hilt testified that he had once delivered a kilogram of cocaine to Tramble at Benford's direction. On another occasion, Benford and Hilt were counting money after selling a kilogram of cocaine, when Rena Benford asked them if they needed help. Although they told her they did not, they directed that she put the money in a safe located in the Uptown Supper Club. Hilt also testified that he and Benford had once purchased a kilogram of cocaine, and that Rena Benford delivered some of the money to her husband in order that he might make the purchase. Co-defendant Cleveland Billingsley testified that upon his release from prison in 1998, he received several ounces of crack and powder cocaine directly from Benford. He also testified that

because *Apprendi* was decided after he was sentenced. *Id*. at 443. However, this Court held that he had preserved his *Apprendi* challenge, such that *de novo* review was appropriate, inasmuch as he "objected at the sentencing hearing to both the amount of drugs attributed to him and the standard of proof required to support that amount." *Id*. We noted in *Humphrey* that while the defendant's counsel conceded at sentencing that the then current standard of review with respect to drug quantity determinations was preponderance of the evidence, counsel nevertheless "challenged the propriety of that standard." *Id*. at 444. We further acknowledged in *Humphrey* that where a defendant has merely objected to the quantity of drugs attributed to him, *Strayhorn* appears to support the proposition that that alone might suffice to find that an *Apprendi* challenge is preserved for appeal. *Id*. at 446. However, rather than relying on *Strayhorn*, we held in *Humphrey* that the defendant in that case had raised much more than an objection to drug quantity but also to the standard of proof used in making that determination and thus his *Apprendi* challenge was preserved. *Id*. at 446.

In determining the appropriate standard of review for purposes of this appeal, this panel is of course bound by our holdings in cases such as *Humphrey* and *Strayhorn*. *See United States v. Jenkins*, 4 F.3d 1338, 1345 n.8 (6th Cir. 1993) (explaining that one panel of the Court is bound by another panel's holdings but not its dicta). Both Nathan and Rena Benford raised constitutional objections to their respective sentences based upon the Supreme Court's holding in *Jones*, which was decided subsequent to trial, but prior to their sentencing, and clearly preserved their *Apprendi* challenge for our review. *Humphrey*, 287 F.3d at 446. While before the district court, the Benfords contended that the *Jones* decision required that the drug amounts be charged in their indictments or be otherwise presented to a jury to be decided beyond a reasonable doubt. The district court

overruled these objections, and instead determined the relevant drug quantities by a preponderance of the evidence. The Benfords now seek reversal under *Apprendi* and *Jones*.

   Rossell pleaded guilty to the drug conspiracy charge. Although he submitted written challenges to the PSIR's calculation of certain amounts of drug quantities attributed to him, he at no time "challenged the propriety" of the district court's using the preponderance of the evidence standard of review to determine drug quantity. *Humphrey*, 287 F.3d at 444. Likewise, Tramble and Stewart submitted written objections to their PSIRs, challenging certain specific quantities of drugs attributed to them, while failing to challenge other such quantities.[5] While *Strayhorn* might

---

[5]For instance, according to Rossell's PSIR, co-defendant Lopez Jackson indicated that he had sold Rossell about an ounce of powder cocaine every other week from July 1994 to July 1998. Rossell corroborated these amounts. (J.A. at 1885.) Taped phone conversations revealed that Jackson and Lopez exchanged quantities of more than an ounce of cocaine on two occasions. Additionally, another transaction was for ten ounces. Rossell submitted written objections to his PSIR, contesting the transaction involving ten ounces, and further arguing that about one-fourth of the cocaine referenced was for his own personal use. (J.A. at 1900.) Tramble's PSIR indicated that he should be held accountable for various quantities of cocaine and cocaine hydrochloride, including 24 grams of cocaine hydrochloride that he had sold prior to his arrest and another 6.5 grams of the same type of drug found on him when he was arrested. (J.A. at 1842.) The PSIR also indicates that Tramble coordinated the sale of various other specific amounts of crack to a confidential informant. (J.A. at 1844, ¶¶ 29, 30, 31.) Tramble challenges none of these quantities, although he does challenge other quantities attributed to him. (J.A. at 1864-65.) According to Stewart's PSIR, she, among other things, assisted co-defendant Ossie Jackie Brydie in selling crack. According to Brydie, Stewart would deliver crack to Brydie, who would then sell it. Brydie estimated that she sold an ounce of cocaine a week for a period of twelve to eighteen months, and that the drugs came from Tramble, via Stewart. While not exactly challenging these facts outright, in her written objections, Stewart did claim that she did not deliver cocaine to Brydie for several months during the relevant period

---

### E.

   The Ninth Circuit recently has noted that there is little "judicial experience" on how to analyze the harmlessness of *Apprendi* error. *Jordan*, 291 F.3d at 1095. That court recognized that to determine whether error is harmless beyond a reasonable doubt where drug quantity is neither alleged in the indictment nor proven beyond a reasonable doubt is a formidable task. *Id*. at 1095-96 (distinguishing prior case where court found that defendant's substantial rights were not affected where drug quantity, although alleged in the indictment, was not found by jury beyond a reasonable doubt). The court explained in *Jordan* that because the indictment did not allege quantity, the court would first have to determine that the grand jury would have indicted the defendant for possessing more than 50 grams of methamphetamine. *Id*. at 1096. Further, as the defendant had no notice of the quantity issue at trial, the court would have to determine whether the defendant would have contested quantity. *Id*. The court would also have to determine beyond a reasonable doubt that considering the evidence presented and not presented, that the jury would have convicted the defendant of the higher penalty--21 U.S.C. § 841(b)(1)(A) instead of § 841(b)(1)(B) or (b)(1)(C). The court held that based on the record, those issues could not be resolved beyond a reasonable doubt. *Id*. The court then went on to adopt a *per se* approach to the issue it faced. "We hold that the government cannot meet its burden under the harmless error standard when drug quantity is neither charged in the indictment nor proved to a jury beyond reasonable doubt, if the sentence received is greater than the combined maximum sentences for the indeterminate quantity offenses charged." *Id*. at 1097.

   This circuit's law is contrary to the Ninth Circuit's position regarding affirming a sentence based on unknowns with respect to both what the grand jury as well as the petit jury

Having made the determination that harmless error analysis is appropriate, however, does not end our inquiry. Where a reviewing court, after examining the entire record, "cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error--for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding--it should not find the error harmless." *Neder*, 527 U.S. at 19. Thus, "a court reviewing a defendant's sentence in which it finds an *Apprendi* error must look to whether the 'omitted element is supported by uncontroverted evidence,' and also 'ask[ ] whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.'" *Candelario*, 240 F.3d at 1308 (citing *Neder*, 527 U.S. at 18-19); *King*, 272 F.3d at 378 (explaining that "some circuits have concluded that a factual finding that *Apprendi* would otherwise require to be determined by a jury beyond a reasonable doubt may be harmless if the court can conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error."). As the Court in *Neder* explained:

> A reviewing court making this harmless-error inquiry does not, . . . "become in effect a second jury to determine whether the defendant is guilty." . . . Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is "no," holding the error harmless does not "reflec[t] a denigration of the constitutional rights involved." . . . On the contrary, it "serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for . . . defects that have little, if any, likelihood of having changed the result of the trial."

*Neder*, 527 U.S. at 19.

appear to support the argument that any challenge to the quantity of drugs attributed to a defendant is sufficient to preserve *Apprendi* error, *Strayhorn* is distinguishable from the instant case. As we explained in that case, the defendant's argument was preserved although "he did not utter the words due process.'" 250 F.3d at 467. Indeed, it would have been pointless for his counsel to have done so inasmuch as neither *Apprendi* nor *Jones* had been decided by the time Defendant was sentenced.[6] *See, e.g., United States v. Jordan*, 291 F.3d 1094, n.4 (9th Cir. 2002) (reviewing *Apprendi* challenge *de novo* where defendant argued in district court that *Jones* required that drug quantity be alleged in the indictment and proved beyond a reasonable doubt); *United States v. Nance*, 236 F.3d 820, 823-24 (7th Cir. 2000) (reviewing *Apprendi* challenge for plain error where defendant could have, but failed to rely on *Jones* to preserve argument for appeal). This case, however, is similar to our decision in *United States v. King*, 272 F.3d 366 (6th Cir. 2001). In that case, after a jury trial, the defendants were convicted of and sentenced for conspiracy to distribute and possess with intent to distribute methamphetamine. *Id*. at 370. Drug quantity was neither alleged in the indictment nor submitted to the jury for a reasonable doubt determination. *Id*. at 374. Despite the fact that one of the defendants objected in the district court to the exact quantity of drugs attributed to him, arguing that the appropriately attributable amount was closer to 300 grams than one kilogram, we reviewed his *Apprendi*-based challenge to his sentence for plain error inasmuch as he failed to raise arguments based on *Jones* or *Apprendi* in the district court.

---

inasmuch as she and Tramble had broken up during that time. (J.A. at 1819-20.)

[6]*Apprendi* was decided a year after *Jones*, which was decided on March 24, 1999. *See Jones*, 526 U.S. 227. Strayhorn was sentenced in February 1999. 250 F.3d at 465-66.

*Id*. at 374-75. We believe the same reasoning applies to Rossell, Tramble and Stewart. Although all three challenged certain quantities of drugs attributed to them, none raised constitutional arguments or otherwise challenged the propriety of the evidentiary standard used by the district court in determining drug quantity. *Humphrey*, 287 F.3d at 444. All three were sentenced after *Jones* was decided and could have relied on that case, as did the Benfords, to challenge their sentences with regard to the determination of drug quantity on constitutional grounds. *King,* 272 F.3d at 374-75; *Jordan*, 291 F.3d at 1095 n.4; *Nance*, 236 F.3d at 823-24. Therefore, we will review Rossell, Tramble and Stewart's *Apprendi* claims for plain error.

### C.

#### Nathan Benford and Rena Benford

With an unspecified drug quantity, Nathan Benford faced a statutory maximum sentence of thirty years as a prior felony drug offender under § 841(b)(1)(C). However, based on the district court's drug quantity determinations, Benford was sentenced to a term of imprisonment exceeding the otherwise applicable default statutory maximum. The district court held Benford responsible for 6 kilograms of powder cocaine and 3 kilograms of crack cocaine, thereby exposing him to the penalty provisions of § 841(b)(1)(A), which calls for a mandatory minimum term of twenty years (240 months) imprisonment for individuals who are prior felony drug offenders. Using its drug quantity calculations, the district court eventually sentenced Benford to a mandatory life sentence under the sentencing guidelines.[7] The court also

---

[7] The district court established a base offense level of 38 based upon a quantity of 1.5 kilograms of crack cocaine. *See* USSG § 2D1.1(c) (Drug Quantity Table). The base offense level was enhanced by a total of six levels (four for Benford's role in the offense under USSG § 3B1.1(b) and

basis. *Id*. at 14. "[A] constitutional error is either structural or it is not." *Id*. The Supreme Court's approach to such errors has been categorical. *Id*. Inasmuch as only a limited class of "fundamental constitutional errors" defies harmless error review, and all other constitutional errors are subject to such review, *id*. at 7, we believe harmless error analysis is appropriate under the facts of this case.

Finally, *King*, 272 F.3d 366, supports the view that harmless error analysis is appropriate where drug quantity is neither charged in the indictment nor submitted to the trier of fact for proof beyond a reasonable doubt. The *Apprendi-based* challenge in *King* was reviewed for plain error. Under that standard of review, before a court may correct an error, it must determine whether (1) there was error, (2) that was plain, and (3) that affected substantial rights. *Id*. at 375. Even then, the error can only be corrected if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id*. We ultimately determined that the defendants' substantial rights were not affected by the *Apprendi* error. *Id*. at 379-80. We explained in *King* that the substantial rights prong of the plain error analysis "is akin to the harmless error analysis employed in preserved error cases . . . ." *Id*. at 378. The difference, however, is that under plain error review the burden is on the defendant to show that the error was prejudicial, i.e., that his substantial rights were affected. *United States v. Vonn*, 122 S.Ct. 1043, 1048 (2002). The tables are turned under harmless error review, as the government bears the burden of showing that the error had no effect on a defendants' substantial rights. *Id*. Nevertheless, the fact that we found in *King* that the defendants' substantial rights had not been affected by the failure to allege drug quantity in the indictment or to have the quantity issue proven beyond a reasonable doubt, supports the view that such error may be harmless if the government can shoulder its burden. *Vonn*, 122 S.Ct. at 1048.

affect the fairness, integrity, or public reputation of judicial proceedings. *Id*. However, the fact that the Court declined to notice the error under plain error review supports the view that such error was not necessarily "structural" requiring automatic reversal, inasmuch as it is difficult to imagine that an error that "*necessarily* render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence," such that "no criminal punishment may be regarded as fundamentally fair," *Neder*, 527 U.S. at 8-9, does not also "seriously affect the fairness, integrity, or public reputation of judicial proceedings," *Cotton*, 122 S.Ct. at 1786.

This reasoning is buttressed by the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461 (1997), in which the issue of materiality in a perjury prosecution was decided by the district court rather than the jury. *Id*. at 464. Under the law that existed at the time of trial, the district court instructed the jury that it did not have to decide the issue of materiality. *Id*. Reviewing the issue for plain error, the Supreme Court reserved the decision as to whether the error affected substantial rights, but ultimately decided not to notice the error inasmuch as it did not seriously affect the fairness, integrity or public reputation of judicial proceedings because the evidence pertaining to materiality was overwhelming and essentially uncontroverted. *Id*. at 469-70. The Court later noted in *Neder,* when analyzing whether omission of an element of the offense from jury instructions was structural error, that the conclusion reached in *Johnson* "cuts against the argument that the omission of an element will *always* [or necessarily] render a trial unfair." *Neder*, 527 U.S. at 9 (emphasis in the original). Likewise, the Supreme Court's holding that the erroneous omission of drug quantity from the indictment does not seriously affect the fairness, integrity or public reputation of judicial proceedings, lends strong support for the proposition that such error is not structural and will not always or necessarily render a criminal trial unfair. After all, structural error is not to be determined on a case-by-case

sentenced Benford to a five-year term of supervised release on the drug conspiracy conviction, which is the mandatory minimum under § 841(b)(1)(A).

Rena Benford faced a default maximum sentence of twenty years under § 841(b)(1)(C). But the district court held her responsible for 1039 grams (1.39 kilograms) of crack and over 500 grams of powder cocaine, thereby exposing her to punishment under § 841(b)(1)(A), which establishes a minimum sentence of ten years (120 months) imprisonment and a maximum sentence of life imprisonment for defendants without a prior felony drug conviction. Using the sentencing guidelines, the district court ordered Mrs. Benford to serve a term of 365 months imprisonment on the drug conspiracy conviction and five years of supervised release, which is the minimum under § 841(b)(1)(A).[8]

---

two for his possession of a weapon during the drug conspiracy pursuant to USSG § 2D1.1(b)). Benford's resulting offense level was 44. Cross-referenced with a criminal history category of VI, the guidelines called for a mandatory life sentence. This sentence was imposed to run concurrently with a 240-month term of imprisonment on Count Two, money laundering. In addition, the five-year term of supervised release ran concurrently with a three-year term of supervised release stemming from the money laundering conviction.

[8]Based upon its drug quantity calculations, the district court determined that Mrs. Benford's base offense level should be 36 because she was involved with between 500 grams and 1.5 kilograms of crack. *See* USSG § 2D1.1(c). Her base offense level was enhanced by two levels pursuant to USSG § 2D1.1(b) for possession of a weapon during the drug offense, thereby raising the offense level to 38. With a criminal history category of III, the sentencing guidelines yielded a range of 292-365 months imprisonment. The district court sentenced Mrs. Benford to the maximum of 365 months. She was also sentenced to concurrent terms of 240 months imprisonment and three years of supervised release on the money laundering count.

Under *Apprendi*, a defendant may not be exposed to a greater punishment than that authorized by the jury's guilty verdict. *Neuhausser*, 241 F.2d at 466 (quoting *Page*, 232 F.3d at 543). Because the jury did not determine a quantity of drugs beyond a reasonable doubt, the Benfords should have been sentenced under the penalties prescribed under § 841(b)(1)(C). The government contends that the district court, in fact, determined the drug quantities attributable to the Benfords beyond a reasonable doubt. This assertion likely stems from statements the district court judge made at Nathan Benford's sentencing hearing:

> I heard about 100 [wiretap] phone calls, I mean. I heard so much evidence of drugs in the conspiracy that, I mean, and it's not only testimony I heard the phone calls.
>
> . . .
>
> We all heard a lot of other evidence as well. I mean, we've seen real evidence and other evidence in this case. *If you want me to say I'm convinced, if you want me to say it, I'm convinced beyond a reasonable doubt that there was drug quantities.* I've already gone over this and I don't have to go over those quantities again, I hope, but, I mean, I don't know what to do, I mean, I heard it all.

jurisdictional in the sense that it affects a court's subject matter jurisdiction, i.e., a court's constitutional or statutory power to adjudicate [the] case. . . ." *Prentiss*, 256 F.3d at 982 (quoting *United States v. Martin*, 147 F.3d 529, 532 (7th Cir. 1998)).

We also decline to categorize the omission from the indictment that occurred in these cases as structural error. The Supreme Court has identified "a limited class of fundamental constitutional errors that defy analysis by harmless error standards." *Neder*, 527 U.S. at 7 (internal quotation marks omitted). Structural errors require automatic reversal, despite the effect of the error on the trial's outcome. *Id*. As for all other errors, "courts *must* apply Fed. R. Crim. P. 52(a)'s harmless error standards, and disregard errors that are harmless beyond a reasonable doubt." *Neder,* 527 U.S. at 7 (emphasis in the original). The error complained of in the instant case is not among those listed in *Neder* that classify as structural.[17] As previously mentioned, structural "errors infect the entire trial process . . . and 'necessarily render a trial fundamentally unfair . . . .'" *Neder*, 527 U.S. at 8 (citations omitted). In other words, structural errors "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair.'" *Id.* at 8-9; *Sanchez*, 269 F.3d at 1272-73.

In *Cotton*, 122 S.Ct. 1781, the Supreme Court declined to address the defendants' argument that the failure to allege drug quantity in the indictment was structural error. *Id*. at 1786. As we previously explained, on plain error review, the Court instead assumed the error affected the defendants' substantial rights but found that the error did not seriously

---

[17] *See Neder*, *supra* note 14.

quantity deprives a court of jurisdiction. *United States v. Longoria*, Nos. 00-50405, 00-50406, 2002 WL 1491784 (5th Cir. July 12, 2002).

Although much authority suggests that a failure to allege an essential element of a crime in the *Apprendi* context is subject to harmless error review, at least one court has reached a different conclusion. The Eighth Circuit has held that where drug quantity is missing from the indictment, harmless or plain error review is inappropriate as to sentences imposed beyond that allowed by 21 U.S.C. § 841(b)(1)(C). *See United States v. Maynie*, 257 F.3d 908, 920-21 (8th Cir. 2001) (holding that *Apprendi* error in indictment is "fundamental," and that where drug quantity is not alleged in the indictment, error must be corrected).

However, it is now settled that the omission of the element of drug quantity from the indictment did not deprive the district court of subject matter jurisdiction over the cases now before us. *See Cotton*, 122 S.Ct. at 1784 (rejecting Fourth Circuit's holding that failure to allege drug quantity in an indictment is jurisdictional, such that it deprives a court of jurisdiction to impose a sentence for an offense not charged in the indictment). "Jurisdiction is the power to decide a justiciable controversy, and includes questions of law as well as fact . . . [and] even the unconstitutionality of the statute under which the proceeding is brought does not oust a court of jurisdiction." *United States v Williams*, 341 U.S. 58, 66 (1951) (citations omitted); *Cotton*, 122 S.Ct. at 1785 (explaining that jurisdiction means "the courts' statutory or constitutional power to adjudicate the case"). Pursuant to 18 U.S.C. § 3231, district courts "have original jurisdiction . . . over all offenses against the laws of the United States." *Id.* "[E]rrors in a non-frivolous indictment do not strip the district court of jurisdiction under § 3231." *United States v. Bjorkman*, 270 F.3d 482, 490 (7th Cir. 2001). Therefore, "[an indictment's failure to allege an element of a crime is not

(Nathan Benford Sentencing Hearing, J.A. at 1492 (emphasis added).) The government argues that the Benfords' rights were not violated even though the court, rather than the jury, established the drug quantities that permitted sentencing beyond the statutory maximum. Contrary to the government's arguments, however, such a finding by the district court would not cure the failure to allege the drug quantities in the indictment and having the issue submitted to a jury where there is a jury trial. *Ramirez*, 242 F.3d at 351; *cf. Strayhorn*, 250 F.3d at 471 (remanding case to the district court so that court could determine beyond a reasonable doubt the issue of drug quantity where defendant pleaded guilty). In addition, despite the court's statements during the sentencing hearing, the record reflects that the district court determined the drug quantities attributable to Nathan Benford by a mere preponderance standard, and not beyond a reasonable doubt, due to its belief that the question did not have to be submitted to a jury.[9] Thus, the Benfords' sentences violated *Apprendi*.

---

[9] At Benford's sentencing, the court stated:

Anyway, here's what I have to say about all of these drug quantities. Based upon what appears in Paragraphs 53, 64, 66, 34, 37, 40, 41, 49, 57, 58 of the pre-sentence report, I get over 3,000 grams of crack. Based upon what appears, the information appearing in Paragraph 26, 66, 29, 45, 55, 56, 57, 58, 62 of the presentence report, I get over 6,000 grams of powder cocaine, powder cocaine hydrochloride.

Now, on top of that, it's evident that there was a whole lot more powder going on and dealt with than what appears in those paragraphs. And, for example, you have, if Mr. Lopez Jackson is to be credited, Mr. Benford would have gotten served something around six kilograms of powder sometime between April and June of 1998, and that's two a month every two weeks. And he could have gotten some more, did more than that between July, July 1998, probably as much, between April and the time that he was arrested.

It's not real easy to find out in this case precisely what powder was what, what crack was what, but I'm convinced that

there was, at least five kilograms of cocaine powder here that are, that is unaccounted for in this amount of crack dealt, assuming . . . that you got to use crack, not the powder that was converted into crack. I'm not sure.

. . .

I think both powder and crack can be counted, even if you cook it into crack . . . and there is a lot more powder, crack cocaine, so the cocaine that it would have taken to make crack was still, was still not accounted for in the numbers in the presentence report. *I'm satisfied by certainly a preponderance of the evidence that, at least a preponderance of the evidence that Mr. Benford in one way or another was involved with the purchase and sale of over five kilograms of powder and 50 grams of crack.*

. . .

*I do not believe that drug quantities are elements of the offense, and I do not believe that drug quantities must be determined by the jury.* As a matter of fact, there is plenty of 6th Circuit authority that says drug quantities are not to be determined by a jury.

(Nathan Benford Sentencing Hearing, J.A. at 1486-88 (emphasis added).) The district court applied the same rationale in sentencing Rena Benford:

Well, let me just say that, as I have just, as I have just said in connection with Mr. Benford that I don't believe the *Jones* case changes anything here. . . . [D]rug quantities are not elements of the offense and must be determined by a Court in connection with sentencing.
And as I think I also pointed out in connection with Mr. Benford's case, the 6th Circuit has actually said in several cases that drug quantities should not be charged in indictments. And, of course, the jury should not be instructed   on making determinations on drug quantities . . . .

(Rena Benford, Sentencing Hearing, J.A. at 1512-13.)

error is jurisdictional. *Id*. at 274 (overruling *United States v. Tran*, 234 F.3d 798 (2d Cir. 2000)). Similarly, the Tenth Circuit initially held that where the indictment failed to allege drug quantity, such a defect was not subject to plain or harmless error review. *See Jackson*, 240 F.3d at 1248-49 (rejecting government's argument that defendant's 30-year sentence was subject to harmless or plain error review where the indictment failed to include essential element of drug quantity). However, that court has revisited its position regarding indictments that fail to allege essential elements of a crime. *See United States v. Prentiss*, 256 F.3d 971, 981 (10th Cir. 2001) (*en banc*) (holding that a "failure of an indictment to allege an essential element of a crime does not deprive a district court of subject matter jurisdiction; rather, such failure is subject to harmless error review"). The Tenth Circuit further held that "[t]o the extent that this Court's prior decisions . . . hold otherwise, we overrule them."[16] *Id*. The Tenth Circuit also expressly rejected the argument that a failure to allege an essential element of a crime in an indictment necessarily falls into the category of structural error, requiring automatic reversal. *Id*. at 983-85. Finally, a panel of the Fifth Circuit previously held that where *Apprendi* error occurs because of a failure to charge drug quantity in the indictment, the error must be corrected inasmuch as the error is jurisdictional, and a district court only has jurisdiction to sentence a defendant to a sentence equal to or less than the statutory maximum. *United States v. Gonzalez*, 259 F.3d 355, 360-61 & n.3 (5th Cir. 2001). However, relying on *Cotton*, 122 S.Ct. 1781, the Fifth Circuit, sitting *en banc*, recently overruled *Gonzalez*, to the extent that case held that an indictment that fails to allege the essential element of drug

[16]*See also McCoy v. United States*, 266 F.3d 1245, 1250 n.7 (11th Cir. 2001) (recognizing that in *Prentiss*, the Tenth Circuit overruled prior cases that had held failure to allege element of drug quantity cannot be reviewed for plain or harmless error).

*cf. United States v. Mojica-Baez*, 229 F.3d 292, 309-10 (1st Cir. 2000) (holding that a failure to include in the indictment the type of weapon involved in the offense under federal firearm statute was not structural error; error did not so "interfere with such basic and fundamental constitutional protections that they go to the structure of our criminal law system").[15]   These courts have essentially determined that where *Apprendi* error occurs in the indictment, such error is akin to the error in *Neder*.  *See, e.g.*, *Sanchez*, 269 F.3d at 1272-73.

Further, the Second Circuit has held that a failure to allege drug quantity in an indictment or submit the question of drug type or quantity to a jury is subject to plain error review, pursuant to Fed. R. Crim. P. 52(b), when the defendant failed to object to these errors before the district court.  *See United States v. Thomas,* 274 F.3d 655, 659 (2d Cir. 2001) (*en banc*). In *Thomas*, the Second Circuit overruled a prior circuit panel's holding in another case, which had held that where an element of the offense is not charged in the indictment, the defect is not subject to plain error review inasmuch as the

---

[15]The firearm statute at issue in *Mojica-Baez* is similar to the drug offense statute at issue in the instant case.  The firearm statute sets forth a minimum penalty of five years for a defendant who, while committing a crime of violence or drug trafficking offense, uses or carries a firearm during the commission of either of those crimes.  *See* 18 U.S.C. § 924(c)(1)(A)(i).  If other factors are proven, the five-year minimum sentence is enhanced.  For instance, if the firearm is brandished, the defendant is sentenced to a term of seven years.  18 U.S.C. § 924(c)(1)(A)(ii).  The type of firearm may also affect the sentence imposed.  For instance, if the firearm is a short-barreled rifle or an automatic weapon, the defendant is subject to a mandatory minimum ten-year sentence.  18 U.S.C. § 924(c)(1)(B)(i).  In *Mojica-Baez*, 229 F.3d 292, the defendants argued that their indictment was constitutionally infirm, requiring "per se" reversal, inasmuch as the indictment did not specify that the firearm they used in the underlying offense was a semiautomatic assault weapon.  *Id*. at 306-07.

### *Charles Rossell; Calvin Nelson Tramble; and Suzette Miranda Stewart*

Rossell, Tramble, and Stewart also each claim that their sentences violated *Apprendi*.  While we have some doubt as to whether *Apprendi* was implicated at all with respect to some of these Defendants' sentences, we need not reach that issue because Defendants fail to show any claimed *Apprendi* error warrants correction under plain error review.

Rossell pleaded guilty to the drug conspiracy charge. Inasmuch as the drug quantity was neither specified in his indictment, nor in his guilty plea, he faced a maximum sentence of thirty years imprisonment as a repeat felony drug offender under 21 U.S.C. § 841(b)(1)(C).  However, when the district court determined by a preponderance of the evidence that his drug quantity was 3.2886  kilograms of cocaine hydrochloride, Rossell was subjected to a sentencing range of 120 months to life imprisonment as a repeat offender under § 841(b)(1)(B), and was sentenced to ten years imprisonment.[10]

Tramble also pleaded guilty to the drug conspiracy charge. However, similar to the indictment, his plea agreement did not specify a drug quantity for the drug conspiracy charge. Thus, with his prior felony drug conviction, Tramble was subject to a maximum sentence of 360 months under

---

[10]Under the sentencing guidelines, Rossell only faced imprisonment for a range of 70-87 months.  This range was derived from a criminal history category of I and a base offense level of 28 for Rossell's connection to between 20 to 50 grams of crack, *see* USSG § 2D1.1(c) (Drug Quantity Table), which was enhanced by two levels pursuant to USSG § 2D1.1(b) for possession of a weapon in connection with the drug conspiracy, and reduced by three levels for acceptance of responsibility pursuant to USSG § 3E1.1, thereby yielding an adjusted offense level of 27.

§ 841(b)(1)(C).   At sentencing, however, the district court determined that Tramble was responsible for 14.5 kilograms of crack, thereby exposing him to a mandatory minimum sentence of twenty years and a maximum of life imprisonment under 21 U.S.C. § 841(b)(1)(A).   Under the sentencing guidelines, Tramble's sentencing range was 292-365 months.[11]   After the government filed a downward

---

[11]Having been deemed responsible for 14.5 kilograms of crack, Tramble's base offense level under the guidelines was 38.  *See* USSG § 2D1.1(c) (Drug Quantity Table).  The district court then enhanced this number by two levels for possession of a weapon during the crime pursuant to USSG § 2D1.1, and by three levels for Tramble's role in the offense under USSG § 3B1.1(b).  After a three-level reduction for acceptance of responsibility, Tramble's resulting offense level was 40. The range of 292-365 months was derived by cross-referencing that offense level with Tramble's criminal history category of I.

   On appeal, Tramble also contests the district court's determination that he was a manager or supervisor in a drug conspiracy involving five or more participants and the resulting three-level enhancement to his base offense level for his role in the offense.

   Section 3B1.1(b) of the guidelines provides, "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase [the base offense level] by 3 levels." Tramble filed an objection to the proposed enhancement, which the district court overruled. His sentencing range under the guidelines range called for a sentencing range of 168-210 months without the enhancement, and 292-365 months after the enhancement for his role in the offense.  On appeal, Tramble does not contest his role in the offense; rather, he disputes the number of individuals involved.  "Determination of a defendant's role in an offense is a factual inquiry reviewed on appeal for clear error." *United States v. Caseslorente*, 220 F.3d 727, 734 (6th Cir. 2000).

   Tramble's PSIR stated that "[d]uring the course of his participation in this offense, Calvin Tramble exercised his management and supervision over Carolyn Millard, Miranda Stewart, Jeffrey Robinson, Kwame Gustus and Jackie Brydie." (PSIR, J.A. at 1849.)  He claims that because the case against Gustus was subsequently dismissed by the government, this Court should reverse the enhancement because the government cannot prove that five people were involved.  However, Tramble's argument seems to misread the requirements of the relevant guideline.  Application

---

(quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).[14] The Court in *Neder* recognized that "most constitutional errors can be harmless." *Id.* at 8 (quoting *Fulminante*, 499 U.S. at 306).  Indeed, "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 579 (1986).

   With these principles in mind, the Supreme Court determined that a district court's error in failing to charge the jury on an element of an offense is simply an absence of a "complete verdict" on every element of an offense which violates a defendant's Sixth Amendment right to a jury trial. However, the Court held that failure to deliver a jury instruction was subject to harmless review because the error did not render the trial fundamentally unfair.  The Court noted that omission of a jury instruction "differs markedly from the constitutional violations [it has] found to defy harmless-error review." *Neder*, 527 U.S. at 8.

   At least two courts of appeal have held that a failure to allege drug quantity in the indictment is subject to harmless error review. *See, e.g., United States v. Adkins*, 274 F.3d 444, 454 (7th Cir. 2001) ("[I]t is now well established in this circuit that *Apprendi* errors in both the indictment and the charge to the jury are subject to harmless error analysis); *Sanchez*, 269 F.3d at 1272-73 (explaining that failing to submit drug quantity to the jury or include it in the indictment is just an element of the trial process and does not rise to the level of structural error--harmless error review is appropriate);

---

[14]The Court even recited a short list of errors, including total denial of counsel, biased trial judge, racial discrimination in grand jury selection, denial of self-representation at trial, denial of public trial, and defective reasonable doubt instruction as examples of structural errors. *See Neder*, 527 U.S. at 8.

## D.

Having disposed of Tramble, Rossell and Stewart's *Apprendi* claims, we are left with deciding how to resolve the Benfords' *Apprendi* challenges. We have already determined that their sentences violated *Apprendi*. The government contends, however, that even if the Defendants have valid claims under *Apprendi*, their judgments should be affirmed because the constitutional errors were harmless. In particular, the government argues, *inter alia*, that Defendants cannot point to any evidence they would have presented to a jury that could lead to a lower drug amount determination because there was "overwhelming evidence" of the drug quantities, *cf. United States v. Duarte*, 246 F.3d 56, 62 (1st Cir. 2001) (holding under a plain error analysis that the proof of a defendant's "complicity in distributing more than 1,000 kilograms of marijuana is so overwhelming that his substantial rights could not have been affected by sentencing him based on that quantity").

Rule 52(a) of the Federal Rules of Criminal Procedure provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." In *Neder v. United States*, 527 U.S. 1 (1999), which was decided shortly after *Jones*, the Supreme Court distinguished between "trial errors" which may be reviewed for harmless error and "structural errors" which are excluded from harmless error review. Structural errors reflect a "defect affecting the framework within which the trial proceeds, rather than simply error in the trial process itself." *Id.* at 8

---

fact that the district court imposed a two-level enhancement to his base offense level under the Sentencing Guidelines for obstruction of justice did not implicate *Apprendi*; resulting sentence did not exceed *statutory maximum* for crime for which defendant pleaded guilty).

departure motion for substantial assistance under USSG § 5K1.1, Tramble was sentenced to a term of 200 months imprisonment and ten years of supervised release, to be served concurrently with a 200-month sentence and three years of supervised release as a result of his guilty plea to aiding and abetting money laundering.[12]

---

Note to USSG § 3B1.1 indicates that in order to qualify for an adjustment under this section, the defendant need only have been the organizer, leader, manager, or supervisor of one or more other participants. USSG § 3B1.1, commentary (n.2). The defendant need not have directed the activities of five or more persons; rather, five persons must have been involved in the conspiracy. The district court determined, and Tramble does not dispute, that he directed the activities of at least one member of the conspiracy. Even without Kwame Gustus, the members of the conspiracy still numbered well more than five participants. In fact, each Defendant in this consolidated action was a member of the conspiracy, which actually involved dozens of participants. Therefore, the district court was within its bounds to set Tramble's initial guidelines sentencing range at 292-365 months.

[12]Tramble also claims that the government did not prove that the substance in which he trafficked was crack as opposed to some other form of cocaine base. He also argues that the government "did not address in much detail" whether the substance was cocaine base at all as opposed to cocaine hydrochloride (powder). Although evidence was brought forth at Tramble's sentencing hearing that could have established that the substance was crack and not some other form of cocaine base or powder cocaine, the determination was made by the district court judge by the preponderance-of-the-evidence standard. Had the court determined that the 14.5 kilograms of crack were actually 14.5 kilograms of powder cocaine, Tramble's base offense level under the guidelines would have been a 32; thus, after raising this number by three levels for his role in the offense, and cross-referencing with a criminal history category of I, Tramble's sentencing range would have been 168-210 months. However, this fact does not implicate *Apprendi* because the rule announced in that case only implicates those sentencing factors that impact upon a statutory sentencing range. If the drug quantity had been correctly determined under the proper standard, Tramble could have still been exposed to the penalties provided by § 841(b)(1)(A) even if the substance in which he trafficked were powder cocaine.

With an undetermined drug quantity, Stewart faced a maximum sentence of twenty years under 21 U.S.C. § 841(b)(1)(C). But the district court determined that she was responsible for 807.6 grams of crack cocaine, thereby exposing her to the penalty provisions of § 841(b)(1)(A), which carries a minimum sentence of ten years and a maximum of life imprisonment. Stewart was eventually sentenced to a term of 190 months' imprisonment and five years of supervised release. On appeal, Stewart claims that her constitutional rights were violated because the indictment did not allege the drug quantity.

As explained previously, we need not decide with respect to the issue of drug quantity whether Rossell, Tramble, or Stewart's sentences violated *Apprendi*. Even assuming that there was error, that was plain and that affected substantial rights, *Olano*, 507 U.S. at 732, we still believe these Defendants would not be entitled to relief. This is so because even "[i]f all three [of these] conditions are met, an appellate court *may* . . . exercise its discretion to notice a forfeited error, . . . *only if* . . . the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 122 S.Ct. 1781, 1785 (2002) (emphasis added). In *Cotton*, the Supreme Court dealt with an issue in a case analogous to the one now before this Court, where drug quantity in a vast drug conspiracy case was neither charged in the indictment nor proven beyond a reasonable doubt. The Court held that because the overwhelming evidence in the record showed that the defendants' drug conspiracy involved drug quantities well above that necessary to impose sentences under the higher ranges of 21 U.S.C. § 841(b), then despite the fact that *Apprendi* had been violated, and even assuming the defendants' substantial rights had been affected, the Court would not address the error because the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings. *Id*. at 1786-87. According to the Court,

inasmuch as these defendants, who were involved in a widespread drug conspiracy, failed to raise their *Apprendi* argument before the district court, the "real" threat to the judicial proceedings would be to allow them "to receive a sentence prescribed for those committing less substantial drug offenses." *Id*. at 1787. Likewise, the overwhelming and largely uncontroverted evidence regarding drug quantity in this vast drug conspiracy to which each of these Defendants pleaded guilty convinces us that affirming their sentences would not seriously affect the fairness, integrity or public confidence of the judicial proceedings. *Id*. Because the Supreme Court has instructed that under plain error review, we may only correct error that seriously affects the fairness, integrity, or public reputation of judicial proceedings, and we find no such error in this case with respect to these three Defendants, we decline to correct any *Apprendi* error that may have occurred in the imposition of their sentences.[13]

---

[13]Stewart also contends that her due process rights were violated under *Apprendi* because the district court increased her base-offense level by two levels after finding by a preponderance of the evidence that she possessed a firearm, pursuant to USSG § 2D1.1(b)(1). She failed to raise this issue before the district court. In any event, we do not believe that the district court's factual finding in this regard violated Stewart's due process rights. *Cf. McMillan v. Pennsylvania*, 477 U.S. 79, 87 (1986) (holding that due process not offended by Pennsylvania statute that allowed trial court to increase a defendant's sentencing range up to a five-year minimum upon finding by a preponderance of the evidence that the defendant *visibly possessed a firearm* while committing an underlying offense; while statute allowed court to "up the ante" on defendant's sentence, it did not alter the maximum penalty for the underlying offense). Further, Stewart pleaded guilty to the drug conspiracy and was subject to a statutory maximum 20-year sentence under § 841(b)(1)(C). We also have already held that the 190-month sentence she received was proper under plain error review, considering the amount of drugs involved in the conspiracy. The fact that her sentencing range under the Sentencing Guidelines was increased because of the district court's factual finding does not change that result. *See, e.g., Harper*, 246 F.3d at 531 n.7 (holding that because defendant's sentence under § 841(b) was proper, the