NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0707n.06

No. 11-2080

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 01, 2013**
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,               )
                                        )      ON APPEAL FROM THE
        *Plaintiff-Appellee*,           )      UNITED STATES DISTRICT
                                        )      COURT FOR THE EASTERN
v.                                      )      DISTRICT OF MICHIGAN
                                        )
ROY WEST,                               )      **O P I N I O N**
                                        )
        *Defendant-Appellant*.          )

BEFORE:      COLE and COOK, Circuit Judges; KATZ, District Judge.[*]

COLE, Circuit Judge.  Defendant-Appellant Roy West was convicted by a jury in the United

States District Court for the Eastern District of Michigan of conspiracy to use interstate commerce

facilities in the commission of murder for hire, in violation of 18 U.S.C. § 1958.  West received a

sentence of life without the possibility of parole.  He now appeals his conviction alleging various

errors at trial.  For the following reasons we affirm his conviction.

I.

In November 2005, as part of a separate drug investigation, the Federal Bureau of

Investigation ("FBI") began wire intercepts of cellular telephones of several individuals, including

a phone used by West.  The calls revealed that Leonard Day, now deceased, who was wanted for

_____

[*]The Honorable David A. Katz, United States District Judge for the Northern District of
Ohio, sitting by designation.

murder in Detroit, had stolen about $100,000 in cash, $250,000 in jewelry, a gun, and car keys from West while hiding out at West's home in Ohio.

Immediately after the theft, West began to search for Day. The FBI determined, based on the phone intercepts, that West posed a threat to Day. Day's cousin, Alvino Cornelius—whose phone was also wiretapped—suggested to West that Day might be located at the Greyhound station near West's home in Akron in order to return to Detroit. West offered to pay $1,000 to whoever went to the bus station to look for Day. He recommended that person take a "heater" because there was "nothing to talk about." The FBI, fearing that Day's life was in danger, similarly searched for Day at the bus station. Day, however, was not located by either party.

West continued to search for Day. The day after the theft, West learned from another cousin of Day's, Matthew Joseph, that Day had returned to Detroit. West and other co-defendants gathered bulletproof vests and firearms in preparation for a manhunt of Day. The FBI recorded West telling one co-defendant, Christopher Scott to "get the pipes ready," and "grab up a whole bunch more things." The FBI believed these were both references to firearms.

Once in Detroit, West threatened Day's family, his girlfriend, Kanisha Crawford, and Crawford's family members in an attempt to locate Day. On the evening of November 11, 2005, West and his associates spotted Crawford outside of a Days Inn in Detroit where Crawford and Day were staying. They tried to approach her, and presumably detain her, however, she escaped into a nearby CVS store and the police were called. West and the others were arrested based on these incidents, but no charges were filed.

West's search continued with the assistance of Scott and Marcus Freeman. More intercepted phone calls revealed that Freeman, who already had a personal relationship with Day's cousins, was "spying" on Day's family in an undercover capacity in order to determine Day's location.

On December 20, 2005, Day was shot while leaving a house in Detriot. The FBI checked the logs for the phone that Freeman had been using. They determined that for most of the day the phone had been used to make calls from the cellular tower nearest the house where Day was killed. Five minutes after the last phone call, residents started calling 911 to report the shooting. Three minutes after the first 911 call, Freeman and Scott called West to say "the situation is over with."

After hanging up, West called another co-defendant and stated "[t]hey say dude up out of here . . . motha' fuckers just called me." Seconds after that conversation West called his brother. His brother returned his call minutes later and West told him "somebody done murdered that . . . Buck man." West had other similar phone calls that day, however, he did not reference the murder when speaking with Day's family members, instead conducting himself as if nothing eventful had happened.

The government's theory at trial was that West, Freeman and Scott got together hours after Day's death to exchange money in payment for the murder. By the early morning of December 21, 2005, the phone used by Freeman was no longer making calls from Detroit but was instead in Akron, Ohio, using the same cell phone tower as West's. Early December 21, Freeman called West and proposed that they meet at West's house in Akron. Later that day, Scott called West and said "Did you count that?" and said "the count" was "fifty-six twenty." According to the prosecution, this was a reference to the amount of money exchanged.

Some days later, Freeman was arrested for an unrelated offense and sent to jail. Phone calls between Freeman and his girlfriend, Candace Brown, were recorded while he was incarcerated. On one call he told her, "Do not fuck that chip up. Dude name in the phone." He also told her "BUC" "still owe me some cheese." According to the government, "BUC" was a reference to West; Freeman believed he had not been paid enough for Day's killing. Later Freeman told another co-defendant, "Go get that Boost phone from the old lady. Buck number in there . . . He still owe me some cheese."

West was indicted for conspiracy to use interstate commerce facilities in the commission of murder for hire under 18 U.S.C. § 1958. He was tried twice. At his first trial, West was tried with his brother and co-defendant Alseddrick West. Alseddrick was acquitted; however, the jury failed to reach a verdict with respect to RoyWest, and the district court declared a mistrial on November 30, 2010. West was retried and convicted. On August 25, 2011, he was sentenced to life imprisonment without the possibility of parole.

West filed a timely notice of appeal arguing that (1) the district court committed reversible error by excluding evidence of third-party culpability; (2) the district court committed reversible error by denying West's motion to suppress the wiretap evidence; and (3) the evidence was insufficient to sustain his conviction. We address these issues in turn.

## II.

West first argues that the district court violated his right to present a defense by excluding evidence of third-party culpability—evidence that some third-party outside of the conspiracy may have been guilty of Day's murder. Day had a long criminal history including numerous violent

crimes and drug crimes. At the time of his murder, Day was a suspect in a double-homicide—and there was a warrant for his arrest for attempted murder of a third victim whose throat had been slit. Furthermore, Day was robbed at gunpoint a few days before the shooting. The thief took some jewelry from Day, shooting at, but not hitting Day as he ran away. There was evidence that Day wanted to retaliate against this thief. West argues that he was wrongly prevented from presenting some of these facts to the jury, which could have raised a reasonable doubt that someone other than Freeman killed Day. The district court allowed some evidence of third-party culpability but excluded the specific details of Day's crimes, holding that it was not relevant. We review evidentiary rulings for an abuse of discretion. *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007). "Even when the district court has abused its discretion in admitting evidence, we do not reverse a conviction if the error is harmless . . . ." *United States v. Lopez-Medina*, 461 F.3d 724, 741 (6th Cir. 2006) (citation omitted).

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal citations omitted) (internal quotation marks omitted). Some evidentiary rules, however, necessarily exclude evidence while carrying out their legitimate purpose in the trial process. These rules are constitutional so long as they are "neither arbitrary nor disproportionate" in reaching legitimate ends and do not "implicate a sufficiently weighty interest of the defendant." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) (internal quotation marks and citation omitted). "[T]he Constitution . . . prohibits the exclusion of defense evidence under

rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted

to promote . . . ." *Id*. However, trial courts may exclude evidence that is not relevant, *see* Fed. R.

Evid. 401, and "[t]he court may exclude relevant evidence if its probative value is substantially

outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also*

*Holmes*, 547 U.S. at 326.

While the district court did limit West's ability to argue that Day had many enemies, the court

also gave West significant latitude in admitting evidence. West was permitted to discuss the robbery

and argue that the man who robbed Day might want him dead. The defense was also allowed to

elicit testimony that various persons in the neighborhood did not like Day, that Day made himself

a target for violence, and that people likely wanted him dead. Furthermore, West informed the jury

that Day was wanted for "very serious crimes," had been involved with illegal drugs, and was

thought to be "armed and dangerous." But evidence of the details of Day's specific crimes—such

as the fact that Day was wanted for attempted murder for slitting a victim's throat and was a suspect

in two other related murders, or that Day may have been looking to retaliate for the robbery—was

excluded.

"The court may exclude relevant evidence if its probative value is substantially outweighed

by a danger of . . . unfair prejudice . . . ." Fed. R. Evid. 403. Here, West had a large body of evidence

and testimony available for his defense to show that persons other than himself likely wanted to kill

Day. The excluded evidence would have added limited value to his claims, while substantially

prejudicing the jury against Day as a victim and a person. The district court properly performed a

balancing test in order to prevent West from presenting overly prejudicial or confusing evidence while allowing him to present evidence necessary to a meaningful defense. Accordingly, the court did not abuse its discretion in denying admission of this evidence.

III.

Next, West argues that the district court committed reversible error when it denied his motion to suppress the wiretap evidence. With regard to suppression matters, we generally review a district court's legal findings de novo and factual findings for clear error. *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002). The probable-cause analysis is performed based on a totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

In order to receive an order authorizing wiretaps under Title III of the Wiretap Act, agents must submit, among other things, a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). "This statutory 'necessity requirement' was designed to ensure that wiretapping is not resorted to in a situation in which traditional investigative techniques will suffice to expose the crime." *Stewart*, 306 F.3d at 304 (internal quotation marks and citation omitted). "Since the issuing judge is in the best position to determine all of the circumstances in the light in which they may appear at the time, 'great deference' is normally paid to the determination of an issuing judge" that the requirements of § 2518(1)(c) have been met. *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)). "Thus, the fact that a . . . reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained

through such a warrant." *Id*. West argues that the affidavit submitted by FBI Special Agent Peter

Lucas was insufficient to meet the § 2518(1)(c) "necessity requirement." Because we find that the

affidavit was sufficiently detailed and thorough, this argument fails.

In forty-four pages, Agent Lucas detailed the steps that had already been taken in the

investigation, why they had failed, and why further steps outside of wiretapping were not likely to

produce successful results. West argues that the government did not provide sufficient explanation

for why investigative techniques were unsuccessful or would be unfruitful if tried. For example, he

argues that further explanation for "why the government could not and/or would not subpoena

testimony" from confidential informants should have been provided. But that is unnecessary. Agent

Lucas explained in his affidavit that although confidential informants had been used, their

information was "not enough . . . to enable the dismantlement of the organization." Furthermore,

the informants were unwilling to testify because their cooperation with law enforcement could put

their own lives and "the lives of their families" in jeopardy. The purpose of the "necessity

requirement" "is not to foreclose electronic surveillance until every other imaginable method of

investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the

difficulties involved in the use of conventional techniques." *United States v. Landmesser*, 553 F.2d

17, 20 (6th Cir. 1977) (citation omitted) (internal quotation marks omitted). Thus, giving appropriate

deference to the issuing court, Agent Lucas's statement that the informants had insufficient

information and were in danger is enough.

Agent Lucas provided similarly reasonable explanations for the inadequacy of other

investigative techniques: undercover agents, granting of immunity to individuals at a grand jury, toll

records and pen register analysis, and search warrants. Because Agent Lucas's statement of necessity was sufficiently detailed and because we defer to the issuing court's determination that the requirements of § 2518(1)(c) were met, s*ee Alfano*, 838 F.2d at 162, we find that the district court did not err by refusing to grant West's motion to suppress the wiretap recordings.

IV.

Finally, West argues that the evidence was insufficient to sustain his conviction. "When considering a challenge to the sufficiency of evidence to sustain a conviction on direct appeal, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The Court draws all reasonable inferences in favor of the government. *United States v. Searan*, 259 F.3d 434, 441 (6th Cir. 2001). "[W]e do not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury." *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). "We will reverse a judgment for insufficiency of the evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Khalil*, 279 F.3d 358, 368 (6th Cir. 2002) (citation omitted).

West admits that the government's evidence conclusively shows that he was looking for Day after Day stole his jewelry and that he offered a cash reward for retrieval of his stolen belongings. He furthermore concedes that the FBI was looking for Day in order to "prevent the anticipated violence if [he and] Day . . . actually confronted each other." Nevertheless, he argues, "[l]ooking for Day is not circumstantial evidence of an agreement to pay money in exchange for Day's murder,"

and he claims that the government produced insufficient evidence at trial to establish that he made any agreement with anyone to murder Day. We disagree.

West cannot meet the high burden of demonstrating that the evidence was insufficient to sustain his conviction in this case. *See United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007) ("[A] defendant claiming insufficiency of the evidence bears a very heavy burden." (citation omitted)). The government's phone recordings included conversations in which West discussed payments and dollar amounts with Freeman and Scott, including a call minutes after Day's death. These calls provided strong circumstantial evidence that West was guilty of making an agreement to pay for Day's murder. "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006); *see also Holland v. United States*, 348 U.S. 121, 137-38 (1954) (holding that circumstantial evidence is no different than testimonial evidence so long as the jury is instructed on proof "beyond a reasonable doubt"). When viewed in the light most favorable to the government, the evidence was sufficient to demonstrate that West was guilty of conspiracy to use interstate commerce facilities in the commission of murder for hire beyond a reasonable doubt. Because the judgment is supported by substantial and competent evidence we decline to reverse on this basis.

V.

For the foregoing reasons, we affirm.