RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0122p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

No. 22-2037

ROY CHRISTOPHER WEST,

*Defendant-Appellee*.

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:06-cr-20185-1—Victoria A. Roberts, District Judge.

Decided and Filed: June 9, 2023

Before: BOGGS, GIBBONS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Jessica Currie, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellant. Craig A. Daly, CRAIG A. DALY, P.C., Royal Oak, Michigan, for Appellee.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge. Roy West was convicted for his participation in a murder-for-hire conspiracy and sentenced to life in prison. After his direct appeals and 28 U.S.C. § 2255 motion failed, West sought compassionate release under 18 U.S.C. § 3582. In that motion, he argued for the first time that his sentence violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). He claimed that the jury instructions given at his trial did not sufficiently require the jury to find that death resulted from the conspiracy—a necessary finding for the court

to impose a life sentence for the crime. The district court found that the *Apprendi* error and West's rehabilitation constituted "extraordinary and compelling reasons" to reduce his sentence and granted West compassionate release after seventeen years' imprisonment. 18 U.S.C. § 3582(c)(1)(A).

On appeal, the government argues that the judgment of the district court should be reversed because it improperly used compassionate release as a vehicle for second or successive § 2255 motions. We agree and reverse.

I.

In November 2005, the Federal Bureau of Investigation ("FBI") began wire intercepts of cellular telephones, including one used by West, as part of an unrelated drug investigation. Over the course of those calls, the FBI learned that a man named Leonard Day had stolen over $300,000 in cash and jewelry, a .40-caliber gun, and car keys from West while hiding out in West's home in Akron, Ohio. FBI agents began to suspect that Day's life was in danger from West and his associates.

Once West learned of the theft, he immediately began searching for Day. Upon learning that Day might be at the Akron Greyhound bus station, West offered $1,000 to anyone who would go to the station and search for Day to get West's jewelry back, instructing them to take a gun with them because "ain't nothing to talk about." DE 726-1, Wiretap Tr., Page ID 8685. Two of West's associates accepted this offer and searched the station for Day but could not find him. FBI agents also attempted to find Day on the Greyhound bus from Akron to Michigan but were unsuccessful.

The next day, November 11, the manhunt extended to Day's hometown of Detroit. West brought "an army" of at least eight other people, as well as firearms and bulletproof vests, to aid in the search for Day. DE 677, Trial Tr., Page ID 7926-29. The group went to various locations where Day had been sighted but could not find him. The group spotted Day's girlfriend outside of a hotel and attempted to confront her, but she escaped into a store where she asked for police assistance. Although West and several associates were arrested in connection with the incident, they were never charged.

Released days later, West returned home to Akron.  With Day and West once again in separate cities, the FBI believed that the threat to Day had diminished but continued the wiretap on West's phone.  The arrests had also spooked some of West's associates, including Michael Bracey, who testified that West offered him $50,000 to kill Day after Bracey expressed reservations about continuing to look for Day.

Marcus Freeman, another associate of West, befriended Day's cousins in an attempt to discover his location.  West, Freeman, and Christopher Scott, another associate, frequently communicated over the coming weeks.  Freeman repeatedly assured West that he was "on it" and "fittin' to wrap this up" for West because he was "embarrassed" that it had taken so long.  DE 726-1, Wiretap Tr., Page ID 8753.

The hunt for Day came to a head in mid-December.  On December 17, Freeman called West for help locating a property on Kilbourne Street in Detroit.  Three days later, Day was fatally shot outside a house on Kilbourne Street.  Cellular data showed a cellphone linked to Freeman and Scott making calls in the area of the killing for hours leading up to Day's death.  Three minutes after a 911 call was made to report the shooting, Freeman called West and repeatedly sang "We get rich, Ohio."  *Id.* at Page ID 8760. Freeman apologized that he could not "get the bonus"—which the government interpreted as West's jewelry—but that "the situation is over with."  *Id.*  West then called Bracey to inform him that "motha' fuckers just called" and told West that "dude is up out of here."  *Id.* at Page ID 8761.  Minutes later, West called his brother and told him that "somebody done murdered that n***** Buck man"—referring to a nickname of Day.  *Id.* at Page ID 8765; *see* DE 677, Trial Tr., Page ID 7919.

In the early hours of December 21, Freeman and Scott drove to meet West at his home in Akron.  Later in the day, Scott called West and said, "Did you count that?" and then told West that the "count" was "fifty-six twenty."  DE 726-1, Wiretap Tr., Page ID 8773-75.  The prosecution argued that this was a reference to the amount of money collected from West, possibly $5,620.

The defense's theory was that West was just one of many people with incentive to harm Day.  Cross-examination of multiple prosecution witnesses revealed that Day's sudden return to

Detroit with flashy jewelry and extra cash had caught the attention of "haters" in the neighborhood. DE 679, Trial Tr., Page ID 8078-80. Just a week before his murder, Day was robbed at gunpoint for the chain he was wearing—one he had stolen from West.

West was indicted in the Eastern District of Michigan for conspiracy to use interstate commerce facilities in the commission of a murder-for-hire under 18 U.S.C. § 1958. After West's first trial ended in a mistrial, he was retried. Relevant to this appeal, the court instructed the jury that a guilty verdict required finding that one or more members of the conspiracy had (1) "traveled in interstate commerce"; (2) "done so with the intent that a murder be committed"; and (3) "intended that the murder be committed as consideration for the promise or agreement to pay anything of pecuniary value." DE 679, Trial Tr., Page ID 8106. While the court defined "murder" under Michigan law, it did not require the jury to make a finding about whether Day's death was the result of the murder-for-hire conspiracy. *See generally*, *id.* at Page ID 8106-08. With these instructions, the jury returned a guilty verdict.

On August 25, 2011, the court held West's sentencing hearing. The Presentence Investigation Report ("PSR") stated that the offense carried a mandatory life sentence. The court, prosecutor, and West's trial counsel all agreed with this assessment and the court sentenced West to life in prison without the possibility of parole. On direct appeal, West's conviction and sentence were affirmed by this court, *United States v. West* ("*West I*"), 534 F. App'x 280 (6th Cir. 2013), and the Supreme Court denied certiorari.

On December 16, 2014, West moved to vacate his sentence under 28 U.S.C. § 2255. The court denied both the § 2255 motion and his subsequent motion for reconsideration. When West sought to appeal, this court denied him a certificate of appealability. *West v. United States*, No. 18-1441 (6th Cir. Sept. 11, 2018) (order). He then petitioned this court to authorize the district court to consider a second or successive § 2255 motion on the ground that the Armed Career Criminal Act's "residual clause" was unconstitutionally vague. We denied that motion as West was not convicted under the residual clause.

On June 17, 2022, West moved for sentence reduction under 18 U.S.C. § 3582(C)(1)(a). He claimed that the jury instructions in his trial of conviction violated *Apprendi v. New Jersey*,

because the instructions only required that the jury find that West conspired to violate the statute. Conspiracy alone carries a maximum sentence of ten years' imprisonment under the statute. 18 U.S.C. § 1958(a). Life imprisonment requires a jury finding that "death result[ed]" from the conspiracy. *Id.* West argued that, because the jury did not make that finding, his sentence was in error, thus justifying his early release. He also argued that his obesity, hypertension, and other medical conditions supported his early release.

The district court found that an *Apprendi* violation had occurred and created harmful error in West's sentencing. It granted compassionate release based on that violation, West's rehabilitation efforts, and other reasons, though it rejected his argument that his medical conditions supported his release. The government appealed, and we granted the government's emergency order to stay West's release pending appeal.

## II.

A district court's grant of compassionate release is reviewed for abuse of discretion. *United States v. Hunter*, 12 F.4th 555, 561 (6th Cir. 2021). An abuse of discretion occurs when the district court "applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *United States v. McKinnie*, 24 F.4th 583, 586 (6th Cir. 2022) (quoting *United States v. Moore*, 582 F.3d 641, 644 (6th Cir. 2009)). "The court might abuse its discretion if, for example, its 'denial was based on a purely legal mistake' such as a misreading of the extraordinary-and-compelling-reasons requirement." *United States v. Ruffin*, 978 F.3d 1000, 1005 (6th Cir. 2020) (quoting *United States v. Richardson*, 960 F.3d 761, 764 (6th Cir. 2020) (per curiam)). The district court might also have abused its discretion "if it engaged in a substantively unreasonable balancing of the § 3553(a) factors." *Id.* (citations omitted).

## III.

The First Step Act allows prisoners to move for sentence reduction under a variety of circumstances, including when "extraordinary and compelling reasons" warrant sentence reduction—also called "compassionate release." 18 U.S.C. § 3582(c)(1)(A)(i); *see United States v. McCall*, 56 F.4th 1048, 1050 (6th Cir. 2022) (en banc). Our court has predominantly defined

what can constitute "extraordinary and compelling" reasons for release by defining what circumstances *cannot* be "extraordinary and compelling." *See, e.g.*, *Hunter*, 12 F.4th at 570 ("[F]acts that existed at sentencing cannot later be construed as 'extraordinary and compelling reasons' to reduce a final sentence."); *McCall*, 56 F.4th at 1066 ("Nonretroactive legal developments do not factor into the extraordinary and compelling analysis."); *United States v. Sherwood*, 986 F.3d 951, 953-54 (6th Cir. 2021) (holding that district courts cannot solely rely on U.S.S.G. § 1B.13 to deny compassionate release).

West, however, argues that this circuit has never directly addressed whether sentencing errors can be considered "extraordinary and compelling" reasons for compassionate release. He claims that his case is distinguishable from *Hunter* and *McCall* because he does not seek release based on a nonretroactive legal development. Instead, he asserts that his circumstances are narrow and rare: a prisoner with an unconstitutional sentence, with no remaining post-conviction avenues for relief, who would be free today if not for failures of the government, the court, and his counsel at every turn. For our purposes, we presume that West is correct that a harmful *Apprendi* violation occurred and consider whether such an error can be considered by district courts in deciding compassionate release motions.

Despite West's claims to the contrary, our en banc opinion in *McCall* dispositively explained that compassionate release cannot "provide an end run around habeas." 56 F.4th at 1058. Because § 2255 provides a specific, comprehensive statutory scheme for post-conviction relief, any attempt to attack a prisoner's sentence or conviction must abide by its procedural strictures. *Id.*; *see generally Preiser v. Rodriguez*, 411 U.S. 475, 485-86 (1973). Once a prisoner has already filed and appealed the denial of a § 2255 motion (as West has done), relief cannot be obtained in a successive § 2255 motion unless new evidence or a new rule of constitutional law is announced. *McCall,* 56 F.4th at 1057; *see* 28 U.S.C. §§ 2255(b), (h)(1)-(2). And West "cannot avoid these restrictions on 'post-conviction relief' by 'resorting to a request for

compassionate release instead.'" *McCall*, 56 F.4th at 1057 (quoting *United States v. Crandall*, 25 F.4th 582, 586 (8th Cir. 2022)).[1]

Even if we could distinguish *McCall*, sibling circuits have held that sentencing errors cannot provide an "extraordinary and compelling" reason for compassionate release. *See United States v. Jenkins*, 50 F.4th 1185, 1200 (D.C. Cir. 2022) ("Legal errors at sentencing are neither extraordinary nor compelling."); *United States v. Escajeda*, 58 F.4th 184, 188 (5th Cir. 2023) ("Because Escajeda's claims would have been cognizable under § 2255, they are not cognizable under § 3582(c)."); *United States v. Amato*, 48 F.4th 61, 65 (2d Cir. 2022) (per curiam) ("[A]rguments challenging the validity of an underlying conviction cannot be raised in a § 3582 motion . . . .  Rather, such arguments are properly raised on direct appeal or collateral review pursuant to 28 U.S.C. § 2255."); *United States v. Ferguson*, 55 F.4th 262, 270 (4th Cir. 2022) ("Appellant's attempt to collaterally attack his convictions and sentence via a compassionate release motion ignores the established procedures for doing so. Namely, 28 U.S.C. § 2255 is '[t]he exclusive remedy' for challenging a federal conviction or sentence after the conclusion of the period for direct appeal[.]" (first alteration in original) (quoting *United States v. Simpson*, 27 F. App'x 221, 224 (4th Cir. 2001) (Traxler, J., concurring))); *Crandall*, 25 F.4th at 586.  This conclusion fits the judiciary's intuition that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

The First Circuit alone has allowed that a sentencing error *might* provide "extraordinary and compelling" reasons for compassionate release. *See United States v. Trenkler*, 47 F.4th 42, 49-50 (1st Cir. 2022).  Trenkler's case was similar to West's: he was sentenced to life in prison on facts that required a jury finding, but no such jury finding was made, and no one uncovered this error until nearly ten years after his conviction and well past his direct appeals and exhaustion of the § 2255 process. *Id.* at 45-46.  The district court in *Trenkler* was similarly sympathetic to this combination of institutional errors and granted compassionate release. *Id.* at

---

[1]*McCall*'s breadth is evident in its application here.  A once highly discretionary decision of the district court, as broadly suggested by the Supreme Court in *Concepcion v. United States*, 142 S. Ct. 2389 (2022), has been severely and categorically cabined.  *See McCall*, 56 F.4th at 1074-76 (Gibbons, J., dissenting).

46. But on appeal, the First Circuit refused to either "reject[] or endorse[] . . . the district court's outcome" and instead vacated and remanded the case for further consideration in light of the recently decided *United States v. Ruvalcaba*, 26 F.4th 14 (1st Cir. 2022). *Id.* at 50.

*Trenkler*, however, cannot support West's argument because the First Circuit's compassionate-release jurisprudence is far broader than our own. *Ruvalcaba* emphasized an "individualized consideration of a defendant's circumstances in connection with a compassionate-release motion," rather than an absolute, "categorial" exclusion of nonretroactive changes in sentencing law. 26 F.4th at 27-28. This view is at odds with the view expressed by our court in *McCall*. *See McCall*, 56 F.4th at 1063 (holding that non-retroactive changes in sentencing law cannot be considered, arguing that "the text of the compassionate-release statute itself" supports "categorical exclusion[s]" (citation omitted)).

Abiding by the spirit and language of *McCall*, as well as the persuasive authority of at least five sibling circuits, we must conclude that the presumed sentencing error in West's case cannot serve as an extraordinary and compelling reason for his compassionate release.

IV.

West is left with the district court's other two "extraordinary and compelling" grounds for relief: sentencing disparity and rehabilitation. Both are insufficient to justify compassionate release here. First, the district court reasoned that other defendants sentenced under the murder-for-hire conspiracy statute have been sentenced to the ten-year statutory maximum—not life imprisonment without the possibility of parole—and therefore a sentencing disparity existed that could be considered by the court as extraordinary and compelling. DE 973, Order, Page ID 12931-32; *see* 18 U.S.C. § 3553(a)(6). But this identified disparity is just the same alleged *Apprendi* error by a different name. If it would be improper to use compassionate release to address sentencing errors and thereby circumvent § 2255, then it would be improper to allow a defendant or court to further avoid this limitation by reframing a sentencing error as a sentencing disparity.

Without the sentencing error or disparity arguments, West is left only with rehabilitation as the basis for his compassionate release. Congress has instructed that "[r]ehabilitation of the

defendant alone shall not be considered an extraordinary and compelling reason" for compassionate release.  28 U.S.C. § 994(t).  Thus, West has not provided any extraordinary and compelling reasons to justify his early release and the district court abused its discretion in reaching the contrary conclusion.

V.

For the foregoing reasons, we reverse the judgment of the district court and remand with instructions to deny the motion for compassionate release.